WHITE ET AL. *v.* COUNTY BOARD
OF APPEALS ET AL.

[No. 139, September Term, 1958.]

*Decided February 17, 1959.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*John Grason Turnbull,* with whom were *Turnbull & Brewster* on the brief, for the appellants.

*M. William Adelson* and *Eugene P. Smith,* with whom was *John G. Arthur, Jr.,* on the brief, for the Wareheims, appellees.

HAMMOND, J., delivered the opinion of the Court.

Neighbors appealed successively, and unsuccessfully, from the Zoning Commissioner to the County Board of Appeals, and from the Board to the Circuit Court, which affirmed the action of the Commissioner and the Board in changing the classification of a tract of land in Baltimore County, zoned residential, from the lowest to higher density in that category. Now, with heads litigiously bloody but unbowed, they have come to this Court.

Eli C. Wareheim and his wife own one hundred thirty-seven acres north of Ridge Road and south of the Baltimore County Beltway west of Thornton Road. Thornton Road runs for some six thousand feet north from Joppa Road, passing under the Beltway, and ends at Seminary Avenue. About twelve hundred feet north of Joppa Road is Ridge Road, which runs west from Thornton Road. The Wareheims' Thornton Road frontage is about twenty-five hundred feet. Between the northernmost point of their Thornton Road line

and the Beltway lie the Markoe and Price properties, each of several acres. The Wareheim tract extends back of—to the west of—these properties to the Beltway, on which it has a frontage of about one thousand feet.

Prior to the rezoning of the entire district by the land use map of 1955, the tract was zoned Residential "A" (cottage), as was the land on the east side of Thornton Road. The 1955 map put the Wareheim land in an R-40 zone (each lot 40,000 square feet), as it did the rest of the unimproved land on the west side of Thornton Road as it now exists, and as projected on the map to the north. A housing development of one hundred sixty acres, known as Thornleigh, lies immediately across Thornton Road from the Wareheim property. When the 1955 land use map was in preparation, Thornleigh was to be zoned R-40 but when the owners pointed out to the County officials that they had already given approval for the construction of houses on smaller lots, the zoning was changed to R-10 (10,000 square feet to the lot) as to the land fronting on and near Thornton Road, and R-6 (6,000 square feet per lot) as to that in the easternmost part of the development near the Northern Central Railroad. The developer has already built 230 houses and plans a total of 450, including those to be built north of the Beltway and south of Seminary Avenue. South of Thornleigh a small stream borders Thornton Road, and east of the stream is a smaller housing development called Spring Valley, in which the houses are comparable to those in Thornleigh.

West of Thornton Road, between the Beltway on the north and Joppa Road on the south, in addition to the Markoe and Price homes, are some ten other houses. These are south of Ridge Road; only four of them face the Wareheim property and these at distances ranging from 250 to 450 feet, and one of them faces Joppa Road. All of these homes are on land zoned R-40, and most of their owners and Mr. Price are the protestants in the case before us.

In December, 1956, the Wareheims, having sold one hundred acres of their land to the developer of Thornleigh subject to the granting of the reclassification now attacked, for use similar to Thornleigh, petitioned the Zoning Commis-

sioner for the reclassification. The Commissioner found that the uncontradicted evidence established changed conditions since the zoning of the land as R-40 in 1955, because adequate sewerage facilities, then thought unavailable, were now available and that "it would appear that the original classification was to a large extent erroneous." He approved the petitioners' plan of reclassification for the one hundred-acre tract, which was (a) to leave an R-40 area of about thirteen acres fronting on Ridge Road, with a depth to the north varying from 250 to 350 feet, opposite the R-40 properties of the protestants on the south side of Ridge Road, and (b) make R-20 (20,000 square feet per lot) twenty-five acres binding on and extending north from the northern boundary of the R-40 zone, with (c) the remaining sixty-two acres (consisting of the frontage on Thornton Road to the southern boundary of the Markoe property, and the frontage on the Beltway to the west of the rear of the Markoe and Price properties) zoned R-10. Thirty-seven acres were to be retained by the Wareheims and to remain R-40.

The protestants appealed this decision, and in January, 1958, the Board found that the presumption in favor of the correctness of the 1955 zoning had been overcome by the evidence that important changes had occurred in the neighborhood immediately prior to the adoption of the 1955 map, and that the changes were great enough to support reclassification. It found that the buffer zones of R-40 and R-20 adequately protected the properties of all protestants south of Ridge Road, and that the holdings of Messrs. Price and Markoe had been as adversely affected as they were likely to be as country places, or large suburban homes, by the coming of the Beltway and the high density development in Thornleigh directly across from them (but had greatly increased potential value as sites for land developments like that of Thornleigh). The Board concluded that no traffic hazard would be created by the rezoning, and granted the rezoning precisely as the Zoning Commissioner had granted it. The Circuit Court thought it unnecessary to determine whether there was error in the original zoning, since it found a change in conditions from 1955 to 1957 in that the 1955 rezoning

had been based on the official belief that sewer facilities were not available to support a higher density than R-40 and that this belief had now been shown to be erroneous, and also found that the testimony as to the traffic hazards presented a reasonably debatable question, and affirmed the Board.

The protestants argue that not only is there a presumption that the zoning of 1955 was well-planned and correct but that, in fact, this was so and that it was part of a well-considered comprehensive plan to keep all land to the west of Thornton Road (as it now exists and as projected) in the R-40 classification, as opposed to the land to the east of the road which was to be zoned for a higher density. They say that no genuine change in conditions since 1955 has been shown, and that the proposed rezoning would create traffic congestion and hazards.

The difficulty for the protestants is that the landowners showed—indeed, almost demonstrated—that the studies in 1953 and 1954, that preceded the adoption of the 1955 land use map, had brought the entire planning staff and the Planning Commission to the unanimous and firm conclusion that all unimproved land south of the Beltway should be zoned R-10 "with the exception of frontage on Ridge Road, giving recognition to the acreage lots that already existed on that road", and that similar land to the north of the Beltway should be R-20 and R-10; that proper zoning required that land on both sides of a road of ordinary width should be zoned alike, that it is not feasible or proper to zone property served by both water and sewers "as close to the City and center of the County as this property" R-40. Further, two things were made clear. The first was that the subject land almost unquestionably would have been zoned R-10, as was the land across the road, on the 1955 map, except for the fact that the Department of Public Works had come to the belief that Roland Run sewer, a line of 22,000,000 gallons daily capacity built to drain the area north of Towson on the west into the Baltimore City disposal system (which ran almost under the Wareheim land and was then about to go into operation), would have to serve all of the area north of Towson including the Dulaney Valley Road developments and the

Timonium and Cockeysville areas. The second was that the Director of Public Works and the County Commissioners, in reliance on this belief, had issued an order to the Planning Commission that all land not already committed otherwise, was to be zoned R-40 to keep occupation to a low enough density level to be accommodated by the Roland Run sewer, and that the Planning Commission followed this order.

The testimony of the then Principal Planner (the Deputy Director of the Planning Commission), that of the then County Commissioner, assigned *ex officio* to the Planning Commission because of his prior experience as Zoning Commissioner and his engineering knowledge, and that of the then and now deputy chief of the Bureau of Engineering, who was liaison man between the Department of Public Works and the Office of Planning, was direct, explicit and uncontradicted, that the Wareheim property, like all other unimproved property south of the Beltway, would have been zoned R-10 on the 1955 map except for the directive from the County Commissioners to zone all such land R-40 without regard to zoning principles or merit. They further testified that the 1955 zoning was erroneous, unless the reason that caused it—the assumed limited sewerage facilities—was a valid reason. There was further testimony that in 1956 plans were started for another major sewer line—Minebank sewer —to be built east of Towson and to be finished in about five years, which would greatly relieve the existing and future demands on the Roland Run sewer. Funds are being collected regularly for the project and several short strips have been built. In light of the proposed Minebank sewer, the County officials changed their views and were agreed that it was feasible and proper to zone land zoned R-40 in 1955, because of the supposed limitations of Roland Run sewer, to a higher density. There was further testimony that Baltimore City, because of the limitations of its disposal system, presently would accept no more than 14.2 million gallons a day of the potential 22 million gallons Roland Run capacity; that in fact the daily average was only 4,000,000 gallons and in the foreseeable future, even though Minebank sewer were not completed, the 14.2 million gallon daily average would not

be reached even if zoning densities were increased generally; and that the houses proposed to be built on the Wareheim tract, if connected to the sewer, would add only inconsequentially to its load.

There was testimony from acknowledged zoning experts that reclassification of the property would not be detrimental to the health, safety, and general welfare of the neighborhood, that it would not interfere in any way with adequate light and air, or cause potential hazards or dangers from fire, or overcrowding or undue concentration of population, that the utility facilities were entirely adequate to take care of the development, and that the development would not tend to create congestion or hazards on the roads around the development.

The landowners also produced acknowledged traffic experts who said that Thornton Road, which had been widened to thirty feet along the Thornleigh development and which was to be widened to forty-two feet if the reclassification were granted, was entirely adequate to take care of the existing traffic, plus the traffic which would be generated by the new development. The protestants' traffic expert did not seriously challenge this conclusion but felt that the difficulty would come at the intersection of Thornton and Joppa Roads. The counter to his belief was that the County was in the process of improving and broadening that intersection and that a traffic light would obviate any hazards. The zoning expert for the protestants agreed generally that zoning should be the same on both sides of a narrow road and that R-40 zoning opposite Thornleigh's R-10 zoning was erroneous and bad zoning, but suggested that the reclassification on the west side of Thornton Road should be to R-20 rather than to R-10, so as to soften the transition from R-10 to R-40.

In *Muhly v. County Council of Montgomery County,* 218 Md. 543, just decided, we reiterated what we had said so many times before. "We have often stressed the presumption that the original zoning was well planned and intended to be permanent; but the question for the reviewing court is merely to decide whether the board's action was arbitrary, capricious, discriminatory, or illegal, not to disturb a finding that is fairly debatable", and added that despite the presumption and the

purpose of zoning to achieve relative stability "* * * zoning can never be completely permanent, and reclassification which finds support in a genuine change in conditions, or clear evidence of mistake, should not be stricken down * * *."

As must appear from the resumé of the facts, the case is at least fairly debatable on all issues. The Zoning Commissioner found a change of conditions and a mistake in the original zoning. The County Board of Appeals seems to have based its action on changed conditions, and the Circuit Court certainly did. Actually, there can be said to be aspects of both original error and change. Error in the 1955 zoning could be found in the assumption that Roland Run would have to take care of the sewage disposal needs of the upper County for an indefinite period and that it could not adequately handle the traffic that would be generated if the Wareheim property and other similar properties were not zoned R-40, an assumption that time proved to have been erroneous in fact. A change in conditions could be found in the plans and preparations for the Minebank sewer, the capacity of which made the 1955 premise as to Roland Run's limitations wrong in 1956 and 1957, assuming it to have been justifiable in 1955. We think it is not important which view is taken for under either, or a combination of the two, the presumption as to the correctness of the 1955 zoning vanishes.

The case is somewhat analogous to several earlier decisions of this Court which have refused to upset reclassifications. In *Wakefield v. Kraft,* 202 Md. 136, 145 and 149, property in Howard County at an intersection was rezoned to commercial from residential as a result, in considerable measure, of the building of a new highway quite close by. This was done quite soon after zoning had been put into effect in the County for the first time. We said, in speaking of the new road and the original zoning: "The testimony was, and it is conceded, that if the County Commissioners had then known its precise future location, they would have then zoned the intersection Commercial A rather than Residential", and added: "Thus, essentially, making the intersection Commercial A was part of an original comprehensive plan for uniform zoning of the whole County."

In *Mettee v. County Commissioners,* 212 Md. 357, 365-367, the Court refused to strike down rezoning to rural residential (40,000 square feet per lot) on July 27, 1954, of land which had been zoned residential (20,000 square feet per lot) the previous January. The chancellor had taken the view that the January action was controlling in the "absence of any substantial change in conditions subsequent to that date, and in the absence of evidence of original error or mistake." This Court held that although there must be more than a mere change of mind of the authorities to justify rezoning, the presumption arising from the original zoning lost its force because, at the time it was adopted, the County Commissioners indicated that it was tentative, and that further consideration would be given to proper action, and said: "The action on July 27th was thus simply a completion of the action begun in January and in substance a part of the original zoning."

We have no difficulty in concluding that not only was the problem before the Board of Appeals as to original error or subsequent change fairly debatable, but that the question as to the traffic hazard was in the same category. *Missouri Realty, Inc. v. Ramer,* 216 Md. 442, 451. There we said in language that is applicable here that the "* * * evidence made the question of reclassification, in so far as it related to traffic congestion * * *, at least, fairly debatable, and rendered it for the experts comprising the Board to consider and determine."

The Circuit Court did not err in accepting the judgment of the Board of Appeals.

*Order affirmed, with costs.*