MOTHERSHEAD, ET AL *v.* BOARD OF COUNTY COMMISSIONERS OF PRINCE GEORGE'S COUNTY, ET AL.

[No. 411, September Term, 1964.]

368

*Decided November 18, 1965.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, HORNEY, MARBURY and OPPENHEIMER, JJ., and FOSTER and JONES, JJ., Associate Judges of the Eighth Judicial Circuit, specially assigned.

*Hervey G. Machen* for appellants.

*Harry L. Durity,* with whom were *Robert B. Mathias* and *Lionell M. Lockhart,* on the brief, for Board of County Commissioners; *Bill L. Yoho,* with whom were *Robert S. Hoyert* and *Roy W. Hooten, Hoyert & Yoho,* on the brief, for Stanley H. Maier, Thomas G. Morgan and Arthur F. Lakin, other appellees.

FOSTER, J., by special assignment, delivered the opinion of the Court.

The appellants, Andrew A. Mothershead and Andrew O. Mothershead, father and son, contending that their property presently zoned I-1 (light industrial) should be reclassified to I-2 (heavy industrial) so as to permit them to continue to conduct thereon a metal fabricating business, appeal from an order of the Circuit Court for Prince George's County affirming the refusal of the Board of County Commissioners for Prince George's County, sitting as a District Council for the County, to grant the reclassification. They state that the questions presented on this appeal are whether or not the decision of the District Council was fairly debatable and whether or not the zoning ordinance otherwise valid was as applied to their property unreasonable, discriminatory, capricious and arbitrary.

The parcel of land for which the rezoning is sought contains 4.002 acres, being the major portion of a 5.035 acre tract owned by the appellants and located in the City of College Park, Prince George's County, Maryland, with a frontage of 68 feet on the south side of Berwyn Road, an easterly border of 539.83 feet lying contiguous to the main line of the Baltimore and Ohio Railroad, a southerly edge abutting property zoned for light industrial use and a westerly side adjacent to lots (zoned R-55, one-family, detached, residential) improved by single family dwellings. A bird's eye view of the vicinity in which the parcel is situated would reveal in every direction an expanse of residentially zoned property with a major railroad line cutting through the middle, north to south, and a principal highway, Greenbelt Road, (a four lane divided highway) running east to west, just south of center. Nestled along the railroad are numerous plots zoned for commercial use and some zoned for light and heavy industrial, but none of those of the heavy industrial category is south of Greenbelt Road which forms a natural barrier, cutting them off from the subject property. The evolution of this pattern is one common to many rural communities where, before the advent of the automobile, the railroad was the only adequate mode of transportation. Businesses tended to cluster by the railroad tracks and remained there while the residences of the commuters sprawled on either side.

Upon a portion of the subject property for a span of over forty years Andrew A. Mothershead has operated a retail coal and feed business to which he added during this period a building materials department. Early in 1940, the grade crossing at Berwyn Road and the railroad tracks was closed and a new road with an overpass bridging the track was located somewhat to the north. With the elimination of the crossing and the shutting off of the flow of traffic past the store and other commercial enterprises in the neighborhood, the business activity in the area gradually declined. Then, in 1944, Andrew O. Mothershead, the son, came to work with his father and further additions were made to the business, including the sale and delivery of fuel oil. The growth of this latter adjunct induced the installation of two 20,000 gallon oil storage tanks in August, 1948. Moreover, to meet the demands of their customers and

competition, they, in violation of the zoning ordinance, expanded their building supply division in 1957 to include the sale of steel beams which were cut to size pursuant to purchase orders, in some instances welded and delivered. Late in the 1950's the steel fabricating operation was incorporated under the name of College Park Fabricators, Inc. By the fall of 1960, the fabricating business had grown to such an extent that it became desirable to erect a shop to house the operation. An application for the building permit was approved, but subsequently rescinded when it was determined that the fabricating of steel fell within the zoning classification of Industrial 2. There followed, in September 1961, a petition by appellants for a zoning map amendment as to the 4.002 acres from I-1 to I-2.

An investigation of this petition was undertaken by the Technical Staff of the Maryland National Capital Park and Planning Commission which recommended that the request for I-2 classification be denied. The Planning Board of the Maryland National Capital Park and Planning Commission, thereafter, contrary to their Technical Staff's conclusion, suggested that the petition be approved. A public hearing before the Board of County Commissioners of Prince George's County, sitting as a District Council, was then held in January 1962. After receiving all the evidence, the District Council denied the petition. The appellants sought review of the District Council's action in the Circuit Court for Prince George's County, Maryland, which affirmed, through Judge Loveless, the action of the District Council on the grounds that the conclusions from the evidence were fairly debatable and the Court could not substitute its judgment for that of the legislative body. Stanley H. Maier, Thomas G. Morgan, and Arthur F. Larkin were parties to the proceedings by virtue of their Motion for Leave to Intervene made and granted on July 12, 1962.

The subject property, leased to the corporate manufacturer at the time the change in zoning was sought, was I-1 by virtue of the northern portion thereof having been so classified pursuant to the comprehensive zoning map of the county adopted in 1949 and the southern portion pursuant to petition No. A-1787 approved November 21, 1951. However, it should be noted that a part of the northern sector, running through the

center of the tract and originally zoned C-2, was placed in the Industrial E zone under petition No. 760, approved June 25, 1946, prior to being included in the I-1 zone established through the 1949 map. The land along Berwyn Road where the store and office are located and running for a distance of about 200 feet toward the rear of the property, or southerly, (not included in the petition for reclassification) is zoned C-2 (general commercial).

The somewhat diffuse attack of the appellants under the initial question posed by them has as its first prong the contention that they did present substantial evidence to the District Council that reclassification was in the public interest and that such evidence is all that is required to sustain their position. They cite *Board v. Oak Hill Farms*, 232 Md. 274, 192 A. 2d 761, and quote from the opinion by Judge Hammond to the effect that where the testimony of experts in behalf of the applicants for change, to which no answer was given by the objectors, left no doubt that the public interests (as well as that of the owners of the land) would be best served by the rezoning, the petition should be granted. This placing by the appellants of reliance solely on the strength of their case and the citing of *Oak Hill Farms, supra*, as authority for justification in so doing cannot carry them successfully forward to a reversal here. *Oak Hill Farms, supra*, the only authority quoted by appellants for this first proposition, carefully points out that there was "no" answer by the objectors to the expert testimony, which absence decisively distinguishes it from the case before us where many answers are made. The test is not whether the appellants adduced substantial evidence on behalf of their request for the change, but rather whether or not all the evidence made the issues fairly debatable, there being no denial that appellees did produce evidence in opposition to the rezoning.

Quite contrary to appellants' view of *Oak Hill Farms, supra*, the Court concluded at p. 283 that:

"* * * the courts have exercised restraint so as not to substitute their judgments for that of the agency and not to choose between equally permissible inferences or make independent determinations of fact, because to do so would be exercising a non-judicial role.

Rather, they have attempted to decide whether a reasoning mind could reasonably have reached the result the agency reached upon a fair consideration of the fact picture painted by the entire record.

In the cases dealing with consideration of the weight of the evidence, the matter seems to have come down to whether, all that was before the agency considered, its action was clearly erroneous or, to use the phrase which has become standard in Maryland zoning cases, not fairly debatable."

When commenting on *Oak Hill Farms, supra,* in *MacDonald v. County Board,* 238 Md. 549, 210 A. 2d 325, the Court said that it affirmed the order of the lower court, in *Oak Hill Farms, supra,* reversing the Council's action denying the petition because it found that there was no evidence to support the Council's order. The proper question then is whether there was sufficient evidence to support the District Council's decision. We think there was.

After their original thrust, the appellants turn to a broader front and take up the subjects of error in original comprehensive zoning or change in conditions so as to warrant rezoning. However, they very frankly admit that "[t]he record clearly shows by competent evidence of mistake and change the only possible creditable evidence submitted in opposition to the request for rezoning would be contained in the staff report and the testimony of Bernard M. Willemain, an expert called by the appellees." The Technical Staff reported that the comprehensive zoning was "based upon the existing industrial uses, the relationship of available vacant land to the railroad and to the location and extent of existing residential areas"; that "industrial areas were located to minimize any adverse effect upon the existing residential development adjacent thereto"; that heavy industrial zoning was located north of Greenbelt Road; that on the west side of the railroad (appellants' side) heavy industrial development has been limited by public opposition and by the construction of single family dwellings; that the 1948 plan and the 1949 zoning map showed a consistent application and use of the I-1 and I-2 zones of lands adjacent to the railroad and both indicate that the application of the two classifi-

cations were reasonable and took into consideration the existing conditions prevailing; that in 1947 and 1948 any tract of land located between the railroad and an existing subdivision was recommended for inclusion in I-1 zoning since it was thought that this was more compatible with residential areas than I-2; that in 1948 homes were being constructed and occupied on lots immediately adjacent to the west of the subject property; that although appellants have expanded their businesses the residential area to the west and south has continued to develop; that no pronounced trend in the neighborhood indicated decay or transition which would justify reclassification; that the original zoning (1949) was not in error; and that the rezoning, if granted, would be spot zoning.

Mr. Bernard T. Willemain, a city planner, appeared as a witness for the Mayor and City Council of College Park at the proceedings before the District Council. He testified that there were no changes in circumstances which would warrant the reclassification requested. In his opinion the appellants were engaged in retailing, not refining or wholesale storage of fuel oil, which only required I-1 zoning for fuel oil storage. The only significant change in the area, he said, was the reclassification from residential to light industrial of nearby property. Of particular importance, he reported that the only heavy industry in the area was over half a mile away, set apart by an effective barrier, Greenbelt Road.

These facts do not leave us with the negative feeling that they are mere "possible creditable evidence," but rather they seem quite substantial, sufficient to make the issue of mistake or change fairly debatable.

Appellants, while conceding that there can be no conditional zoning, continue to urge that they should be granted I-2 zoning on equitable grounds because in their opinion the fabrication of steel is not nearly as offensive as are most other uses permitted under an I-2 classification. They attack the court's decision on the ground that there was a mistake when their property was classified for the 1949 map and claim that changes in the area have taken place since that date. On the point of mistake, they rely on the contention that the property at the time of the adoption of the 1949 map was actually burdened

by an I-2 use and therefore should have been so classified then. There are several answers to this.

First, there is a strong presumption of the correctness of the comprehensive rezoning; secondly, there is considerable doubt that the retail sale of fuel oil requires an I-2 classificacation; and thirdly, even assuming that the fuel oil business requires I-2 zoning there is no evidence that the existence of such business when the 1949 map was adopted would have brought about an I-2 classification for the entire 4.002 acres or even a part thereof.

In *Reese v. Mandel,* 224 Md. 121, 167 A. 2d 111, at p. 128, this Court said: "In testing the action of the Board of Appeals herein, we start off with a strong presumption of the validity of the classifications made when the comprehensive map was adopted." Also, see *MacDonald v. County Board, supra,* and *Miller v. Abrahams,* 239 Md. 263, 211 A. 2d 309.

When the studies, under the supervision of Mr. Fred W. Tuemmler, who was Director of Planning for the Maryland National Capital Park and Planning Commission, from 1941 to 1952, were made in preparation of the zoning ordinance that was ultimately adopted in November, 1949, the center section of appellants' property was zoned Industrial E (the sole industrial classification then in existence) and the two 20,000 gallon oil storage tanks had not then been installed. Between the time of the studies and the adoption of the 1949 map a permit was obtained for the installation of the tanks and their erection above ground was completed. Appellants argue that if the Park and Planning Commission had known of the existence of the tanks they would have recommended placing the property in the I-2 classification. This is only speculation. Although there was testimony that the Commission sought to avoid recognizing nonconforming uses, there is no evidence in the record that one might not have been recognized here, if it were actually required. And so, even though Tuemmler, as Director of Planning, might have opposed a non-conforming use and thought it reasonable to establish under the circumstances an I-2 classification if requested by the owners, the record offers no more than his present conjecture of what might then have been done. Further, this assumed need for I-2 zoning is based in part on

his belief that the fuel oil business involved was, as he stated "wholesale storage of petroleum products," to which additional reference will be made. The weight to be attached to this testimony furnished by a witness not charged with the responsibility of any final decision must be reviewed in the light of the prior holding of this Court that even the statement of a member of the legislative body which adopted the map, "that he thought an error had been made was not conclusive of that fact." See *Reese v. Mandel, supra,* p. 128.

Appellants persist in maintaining that the fuel oil business conducted by them falls within an I-2 classification. The forerunner of this enterprise was a retail coal business and the evidence points to a replacement of the retail coal sales with retail oil sales in accordance with modern trends and the present popularity of oil fired furnaces. It scarcely can be seriously argued, we think, that this operation, serviced from only two oil storage tanks with a limited capacity of forty thousand gallons, was other than retail. Petroleum Refining or Wholesale Storage is prohibited in an I-1 zone by Section 22.11 of the Zoning Ordinance for the Maryland-Washington Regional District in Prince George's County, Maryland, but since Fuel Storage Plant or Yard (coal, coke, gasoline, oil, wood, etc.) is only specifically prohibited from the higher classification C-2 (general commercial) it would seem (although we make no such finding) that such a use is permitted in an I-1 zone, the ordinance being of the exclusionary character. The tanks occupy a minute part of the tract under consideration so that even if the Board of County Commissioners had been aware of their existence in 1949 there is little reason to assume that the entire property would have been included in an I-2 zone. This is particularly true when considered in connection with the fact that the appellant sought and later received on November 21, 1951, subject to certain restriction, under Petition No. 1787, Class I-1 zoning for the extreme southerly section of the property. It must be assumed that the authorities then knew of the installation of the tanks.

The almost complete lack of reference to facts which would establish a sufficient change in the character of the neighborhood to require a reclassification or any argument on the issue

leads us to the conclusion that this contention has been abandoned. Certainly, the testimony produced by the appellees of increased residential construction in the area and that there had been no I-2 zoning granted would make the issue, at least, fairly debatable.

There are no facts in the record which support the appellants' assertion that the District Council based its decision on a "plebiscite" of the opposing neighboring property owners. This contention rests on the bare conjecture of the appellants.

Similar charges of "plebiscite" were made, or the Court had occasion to comment upon the unlawful restricting of individual rights by a legislative body, allegedly based on the exercise of the police power, where the determination was made solely on the ground that property owners objected, in *Benner v. Tribbitt*, 190 Md. 6, 57 A. 2d 346, *Montgomery County Council v. Scrimgeour*, 211 Md. 306, 127 A. 2d 528, *Mettee v. County Commissioners of Howard County*, 212 Md. 357, 129 A. 2d 136, and *Sampson Brothers (Md.), Inc. v. Board of County Commissioners of Prince George's County*, 240 Md. 116, 213 A. 2d 289. A most appropriate observation on the subject was made by Judge Henderson when he said in *Mettee v. County Commissioners of Howard County, supra*, at p. 364:

> "Obviously, an exercise of the police power cannot be made to depend upon a count of noses, but, on the other hand, the very fact that a public hearing is required before the adoption or reconsideration of a master plan indicates that public sentiment on the proposal is not wholly irrelevant. The zoning authorities are by no means bound to regard the wishes of property owners, but their decision is not to be condemned simply because it adopts the views advocated by a majority of the persons primarily affected."

A public hearing is required on zoning petitions in Prince George's County. Zoning Ordinance, Prince George's County, Maryland, Section 29.3.

As pointed out by the appellees, if they have legitimate grounds for attacking the zoning petition at the hearing they will be penalized, under the appellants' theory, for so doing and

on the other hand if they sit idly by their arguments against reclassification will never be known; in either event they lose. This is not the law.

The second question, the validity of the zoning ordinance as applied to the subject property under the evidence, according to the appellants, raises several issues. Initially, they say and cite *N. W. Merchants Term. v. O'Rourke*, 191 Md. 171, 60 A. 2d 743, as authority for this proposition, that "[i]n order to impose restrictions some valid exercise of the police power must be proven, but such power is invoked for the protection of the property restricted and not to give protection to surrounding property," p. 187. The facts in *Terminal* were diametrical to those here; there the neighbors endeavored to upgrade zoning from commercial to residential while in the instant case the appellants seek to expand from limited industrial use to almost unlimited uses.

Next, they submit that "the uses permitted in the Industrial Zones are so restricted when applied to the facts of this rezoning as to amount to an unlawful taking." In the light of the lawful uses presently being made by the appellants of their property and the vast number of additional uses permitted and feasible under existing zoning, this charge is void of any substance. Cf. *Frankel v. City of Baltimore*, 223 Md. 97, 162 A. 2d 447; *Sapero v. M. & C. C.*, 235 Md. 1, 200 A. 2d 74, and *Baltimore City v. Borinsky*, 239 Md. 611, 212 A. 2d 508.

Following this they contend "that to prohibit the cutting and welding together of finished steel beams to form part of a finished beam is not a type of metal fabrication that should be prohibited, in light of all the types of industrial usages permitted in the I-1 classification." What uses are to be included in a classification under a zoning ordinance is a question for the legislative wisdom of the Board of County Commissioners and is not subject to judicial review unless obviously unreasonable or arbitrary. See *Wakefield v. Kraft*, 202 Md. 136, 96 A. 2d 27. The facts here do not demonstrate any unreasonable or arbitrary exclusion of metal fabrication from an I-1 zone. Appellants' witness, Mr. Walcroft, and others, testified that the noise of a railroad train passing appellants' property "almost drowned out the noise" coming from the fabrication

shop. If the sound created by a passing railroad train does not mask the racket emitted from a metal shop there can hardly be any doubt that at least the Board of County Commissioners' decision to include metal fabrication in an I-2 zone was fairly debatable. The testimony of several of appellees' witnesses and tape recordings of the noise further establish the extent and volume of the noise and its objectionable character. But, of even more important consideration, is what may be expected from operations generally carried on within a classification, not by just one particular fabricator, and it strikes us as reasonable that generally a metal fabrication plant should be excluded from an I-1 (light industrial) zone. Again, appellants unrealistically argue that their special "type" of fabrication is not seriously objectionable and that a whole new classification should be established for them. This is not consistent with zoning law practices.

The facts of *City of Amarillo v. Stapf,* 109 S. W. 2d 258, (Texas), referred to by appellants vary so greatly from those presented here that it totally fails of applicability.

> *Order affirmed, appellants to pay the costs.*