FINNEY, ET AL *v*. HALLE, ET UX.

[No. 466, September Term, 1964.]

226

*Decided February 2, 1966.*

The cause was argued on 10/20/65 before PRESCOTT, C. J., and HAMMOND, HORNEY, MARBURY and BARNES, JJ.; and re-argued on 11/12/65 before PRESCOTT, C. J., and HAMMOND, HORNEY, MARBURY, BARNES and McWILLIAMS, JJ., and EVANS, J., Associate Judge of the Fifth Judicial Circuit, specially assigned.

*Edward C. Covahey, Jr.* and *J. Elmer Weisheit, Jr.,* (on both arguments) for appellants.

*W. Lee Harrison* (on both arguments) for appellees.

BARNES, J., delivered the majority opinion of the Court. HAMMOND, J., dissents. Dissenting opinion at page 242, *infra.*

The appeal and cross-appeal in this case are from an order passed on December 22, 1964 by Judge Turnbull in the Circuit Court for Baltimore County in which that Court affirmed an order of the County ·Board of Appeals of Baltimore County (Board), dated June 11, 1964 granting a reclassification of 49.672 acres of land owned by Milton L. Halle and wife, the appellees and cross-appellants, located at the northwest quadrant of the Baltimore ·County Beltway (Beltway) and· Park Heights Avenue from R-20 (residence, one family, 20,000 square foot lot) and R-40 (residence, one family, 40,000 square foot lot), to R-A (residence-apartment) but reversed the

Board's order granting a special exception for elevator apartment buildings. George G. Finney, fourteen other individuals and two improvement associations, are the appellants and cross-appellees. The individuals are apparently the owners of nearby land and aggrieved by the portion of the order of the Circuit Court affirming the Board's approval of the reclassification. No question was raised below or in this Court in regard to their status to take and prosecute this appeal from that portion of the Circuit Court's order. The appellees have filed a cross-appeal from that portion of the order of the Circuit Court reversing the Board's granting of the special exception.

The property of Mr. and Mrs. Halle, which is the subject matter of the zoning reclassification involved in this case, consists of 49.672 acres of land bounded on the north by Hooks Lane (a part of which is a paper road), on the south by the Beltway, on the east by Park Heights Avenue and on the west by the rear yards of houses on Reservoir Road. This property (the subject property or the Halle property) was purchased by Mr. and Mrs. Halle in 1942 as a part of a larger tract with additional land purchased by the Halles, consisted of approximately 69 acres, known as the Pillbox Farm. The Pillbox Farm when purchased by the Halles was improved by a substantial 140 year old fieldstone residence, tenant house and barn. The Pillbox Farm had no frontage on Park Heights Avenue and the only means of access to it by public road was by means of Hooks Lane, westwardly to Reisterstown Road. Hooks Lane had a varying paving width of from 9 to 14 feet on a right of way of from 20 to 30 feet. The portion of Hooks Lane from the Pillbox Farm eastwardly to Park Heights Avenue had never been paved or maintained as a road, and although it was passable and infrequently used during the early years of the Halle occupancy, ultimately fell into disuse, became overgrown and impassable.

The comprehensive zoning map for this area was adopted on January 16, 1957. At the time of the adoption of this map, the Pillbox Farm property was bounded on the south by the Druid Ridge Cemetery, on the east by a parcel of land owned by Overbrook Development Company, a subsidiary corporation of the cemetery corporation and used for nursery stock and sales, on

the west by the municipally owned Pikesville Reservoir and the rear yards of houses on Reservoir Road and on the north (for the substantial part of the northern boundary) by the unpaved portion of Hooks Lane already mentioned and which had become impassable. A rectangular 2 acre parcel on the northern boundary toward the west had been used by Mr. Halle to build a home for his son. This 2 acre tract was later sold to a Dr. Weinburg, reducing the acreage of the Pillbox Farm to approximately 67 acres. North of Hooks Lane the land consisted mainly of farms and large acreage estates. To the east of Park Heights Avenue across from the Overbrook Development Company then used for the nursery business, was a tract of land owned by a Mrs. Barton which was improved by large English Manor type buildings which with the adjoining pastures, were occupied by the Baltimore Humane Society. To the south of the Baltimore Humane Society property and east of Park Heights Avenue was a parcel of land which had an extensive road frontage and was occupied by the radio towers of Station WCAO. The comprehensive zoning map did not show the Beltway even as possibly proposed. The Baltimore County authorities knew that the Beltway was to be located in this general area but the plans and design of the interchanges of Stevenson Road and Park Heights Avenue with the Beltway were not approved until April 15, 1959 or more than two years after the promulgation of the comprehensive zoning map.

After the plans for the Beltway were finally approved, the State Roads Commission of Maryland in December, 1961 instituted condemnation proceedings to acquire title to that portion of the Pillbox Farm required for the construction of the Beltway. The land necessary for the construction of the Beltway split the Pillbox Farm substantially in two parts, leaving the Halles with only 35 or 36 acres to the north of the Beltway. The taking completely destroyed the house, the tenant house, the barn and several other out buildings. It left, without access, the land of the farm lying to the south of the Beltway which was also taken by the State Roads Commission.

Prior to the construction of the Beltway, it was physically possible to have provided a sewer for the Pillbox Farm by running a sewer extension out to Park Heights Avenue, approxi-

mately 1600 feet southerly to an existing sewer, but after the construction of the Beltway and the bridging of Park Heights Avenue over the Beltway it was no longer physically practicable to run sewers down Park Heights Avenue because of the new bridge. At the time of the construction of the Beltway, a sleeve (an 8 inch pipe) for a sanitary sewer crossing was installed under the Beltway for a distance of approximately one-third of the length of the Halle property running westwardly from Park Heights Avenue.

Inasmuch as it was impossible to provide sewer facilities for the Halle property after the construction of the Beltway and the Park Heights Avenue bridge over it, Mr. and Mrs. Halle acquired a right of way through the Druid Ridge Cemetery property lying to the south of the Beltway. This right of way was acquired by two conveyances—one in August 1963, the other in March 1964—the last one being through the parcel of land which the State Roads Commission had taken from Mr. and Mrs. Halle and conveyed to the Druid Ridge Cemetery Company. This parcel of land had theretofore been used for nursery purposes. The cost of this parcel and the cost of acquiring the right of way amounted in the aggregate to $134,000.00

Hooks Lane, the northern boundary of the subject property, is in the approximate location of the top of the water shed or the divide for natural drainage purposes, the water flowing naturally by gravity to the south for the area south of Hooks Lane toward Moores Run and flowing naturally by gravity to the north for the area north of Hooks Lane toward Jones Falls.

At the time of the adoption of the comprehensive zoning map in January 1957, the public water supply in the general area was inadequate to such an extent that it was necessary to restrict construction in the area as late as 1961. In 1962, however, these building restrictions were lifted because of a number of changes in the water system, including a new 36 inch water main which extended through the reservoir, down Hooks Lane and back to Reisterstown Road at Hooks Lane. All of the work involved some 23,000 feet of line and cost approximately $1,250,000. A new pumping station has been erected and at the time of the hearing before the Board, a 1,000,00 gallon

storage tank was under construction at Pleasant Hills, and virtually completed.

There is a Baltimore Transit Company bus route on Reisterstown Road approximatley 1500 feet from the subject property. There is immediate access from the subject property to the westbound lane of the Beltway and also to the eastbound lane by a service or connector road between Park Heights Avenue and Stevenson Road on the south side of the Beltway. A third lane in each divider is planned for the Beltway within the next 6 years. By use of the Beltway two large regional shopping centers are readily available to the subject property: 1) Town Plaza is 10 to 15 minutes to the east and 2) Westbrook is within 20 minutes to the west. Another large regional shopping center, Reisterstown Plaza, is approximately 10 minutes to the south and there are complete neighborhood shopping facilities within 5 minutes driving time in Pikesville.

The Deputy Zoning Commissioner, after a hearing, denied, on October 10, 1963, both the reclassification to an R-A zone and the special exception for elevator apartment buildings. He stated in his order that "the testimony produced at the hearing did not indicate that the Official Zoning Map of Baltimore County was in error when adopted by the County Council." Curiously enough, he made no finding in regard to a change in conditions in the area. A timely appeal was taken to the Board and substantial evidence was taken at the hearing before the Board on April 21, 1964.

At the hearing before the Board, Lester Matz, a registered professional engineer in Maryland and Delaware, who has practiced as a Civil-Sanitary Engineer for 14 years and who is president of Matz, Childs and Associates, Inc. testified for the owners. His qualifications as an expert are quite impressive. He prepared the plot plan for the owners and testified without contradiction to many of the facts already set forth. Mr. Matz was of the opinion that after the construction of the Beltway it would have not been economically feasible to develop the subject property under R-20 and R-40 zoning with the 77 permitted individual houses because of the water and sewer situation and the substantial cost involved in the construction of a sewer line and the acquisition of rights of way.

There was testimony by Gordon Sugar, a builder with experience for 15 years, who has developed land in the general area, that after making percolation tests on the subject property, a septic tank system would not operate in the area and probably would not be permitted by Baltimore County.

Bernard Willemain, a civil engineer and landscape architect, with unquestioned qualifications as an expert land planner, and who for 5 years was Deputy Director of the Baltimore County Planning Commission before he went into private practice, reviewed the factual situation and concluded that in his opinion "apartment use, with a special exception for apartments, represents not only the proper zoning for the property, but the most desirable use for the property, the most desirable one in the public interests." He stated that there was an unquestioned need for the type of apartments that could only be met with elevator buildings and that the subject property "is ideally situated and seemed to meet this particular need." He gave his detailed reasons for these conclusions. In his opinion this was a recognizable need on January 16, 1957 and this need was not met by the adoption of the comprehensive zoning map so that there was an error in the original zoning. He also testified to a number of changes affecting the subject property since the adoption of the comprehensive map.

Dr. Walter Worthington Ewell, a civil engineer of outstanding qualifications generally and particularly in regard to traffic problems, gave detailed testimony for the owners in regard to traffic tests, and conditions that the proposed re-classification of, and the erection of elevator apartments on, the subject property would not create a traffic hazard.

George E. Gavrelis, a well qualified planner, who prepared the Recommendations of the Planning Staff of Baltimore County, dated September 27, 1963, to the Zoning Commissioner, testified that its recommendations were:

> "1. The subject property is situated at the northwesterly quadrant of the Interchange of the Beltway and Park Heights Avenue. Park Heights Avenue is a radial route emanating from Baltimore City. Portions of Park Heights Avenue have been developed for elevator apartments in Baltimore City. The char-

acter of the land usage in the area immediately north of the Beltway appears to be institutional. A cemetery and a reservoir exists on the south side of the Beltway.

"2. The subject property comes closer to meeting the locational criteria established and used by the Planning Board in locating apartment zoning than have other recent requests for apartment zoning elsewhere in this area. The Planning Staff sees a definite difference between the locational factors affecting apartment zoning on the subject property and those other properties in the area which also had requested apartment zoning. In many ways the location of the subject property is similar to the Strickland property at the southwest quadrant of Charles Street and the Beltway.

"3. The Planning Staff, however, does not concede that an error was made in the Third District Zoning Map or that the physical character of the neighborhood has changed to an extent that necessarily justifies apartment zoning here."

Mr. Gavrelis further testified that the locational criteria had not been adopted by the Planning Board until 1962 or substantially after January 1957, when the comprehensive zoning map was adopted, and his testimony indicated that:

"* * * the essence of our comment is to, in effect, state that the Halle tract comes awfully close and does substantially meet with the locational criteria that the Planning Staff and the Board has utilized in the creation of apartment zoning elsewhere."

The protestants produced two expert witnesses, a civil engineer and traffic expert and also a real estate expert, who testified that in their opinion respectively, there would be a traffic hazard and a detrimental effect on the surrounding residential properties if the proposed reclassification and special exception were granted. Six neighboring property owners also testified in opposition to the granting of the reclassification and special exception.

The Board, on June 11, 1964, rendered an elaborate and well considered opinion in which, after reviewing in some detail, the changes which had occurred in the area since the adoption of the comprehensive zoning map in January 1957, including the erection of the Beltway, the sewer and water situation, the acquisition of rights of way and the 13.156 acre tract by the Halles, giving access to the subject property on Park Heights Avenue, and various construction and zoning changes, concluded as follows:

"We feel that there is little question but that there have been substantial changes in the area which justify the reclassification of the tract in question. Additions to public water and sewer facilities are of major importance as is the effect of the Beltway construction. In addition, we concur with the comments of the Department of Planning that the character of the land usage at this intersection is largely institutional or non-residential in nature and *it appears to be an ideal site for elevator apartment buildings in view of the local [locational] criteria established and used by the Planning Board.* This criteria was not developed or in being at the time of the adoption of this map but came into being within the last two years. Moreover, *there was testimony that there is a need for apartment zoning in the area none having been established on the map when it was adopted in 1957, with the exception of two acres which were also fully improved for office building purposes.*

"We have carefully weighed the testimony of the real estate experts and the traffic engineers who testified in the case. *We do not believe that the creation of apartment zoning and special exception for elevator apartment buildings at this site would have any detrimental effect on any surrounding properties* which view is supported by the fact that Dr. Weinberg, the owner of the two acre parcel which was carved out of the original Halle tract, did not appear nor voice any objection. Similarly, *we do not believe that there would be any traffic hazard or congestion created by*

*the proposed project.* The testimony indicated that it would be constructed in three stages which unquestionably would require a number of years before full development was reached. There appears to be little question that any possible problems would arise which could not be corrected by the installation of traffic lights if there was any necessity whatsoever to do so. However, in this regard, we are convinced that any traffic generated by this project would be adequately and safely handled by the existing facilities.

"*In addition to the foregoing, we are convinced that the general welfare of the entire neighborhood would be enhanced by the provision of an elevator apartment zone in this area of sufficient size to adequately satisfy the need for sometime to come.* We cannot ignore the fact that a number of applications have been filed and considered by us in the same area. *Unquestionably, this is the best location for high rise apartments* and the creation of such a zone at this location would undoubtedly tend to satisfy demands for high rise apartment zoning in the area and to stabilize zoning conditions generally. It appears fundamental that the pressures for apartment zoning and particularly high rise or elevator apartment zoning, will continue until the demand is satisfied. We do not wish to give the impression that our decision is based upon such a consideration. However, it is a factual condition which must be given some recognition and consideration.

"*There was also testimony that sanitary sewers in the area have been reinforced and supplemented since the adoption of the zoning map* in this case by the construction of the Moores Run Interceptor. The applicants here have acquired all necessary off site rights-of-way and there is no problem with either capacity or rights-of-way for off site sewer and reinforcement. All rights-of-way either are owned by the applicants or are located in state highways or county roads for which none will be required. The testimony in the case was uncontradicted that the costs of providing

sanitary sewer for the proposed project, now that the Beltway has been constructed, will be $130,000. If the property were developed under its present zoning the costs of providing sanitary sewer would be $110,000. The possibility of serving the majority of the property by septic tank is extremely doubtful because of percolation problems indicated by tests and by difficulty experienced in other developments in the area. *It would hardly appear economically feasible to attempt to develop the subject tract under the 'R-40' and 'R-20' zones in view of these costs."* (Emphasis supplied).

Commissioner Baldwin concurred in the opinion of the Board, but indicated that he was not in a position as a new member of the Board to agree that the subject property is "unquestionably the best location among a number of applications filed and considered in this same area," but he was of the opinion that the elevator apartments would not be inharmonious with the existing uses of the remaining three quadrants" and that the "apartment and institutional uses are quite compatible." He indicated that he did not agree with the majority that it would not be economically feasible to develop R-40 and R-20 as presently zoned.

On appeal to the Circuit Court for Baltimore County, Judge Turnbull at first, by an order of October 26, 1964, reversed the Board on both the reclassification and the special exception, apparently under the impression that the Beltway had been used by the County Zoning authorities as a barrier on the development of the Third District Zoning Map and relying on the case of *Hewitt v. County Commissioners of Baltimore County,* 220 Md. 48, 151 A. 2d 144 (1959). After a petition for reargument was filed and an answer to it filed, the trial court, upon reconsideration, by its order of December 22, 1965, affirmed the Board as to the reclassification and reversed the Board as to the special exception.

We have concluded that the trial court properly affirmed the reclassification by the Board but was in error in reversing its grant of the special exception which should also have been affirmed.

As has been indicated, the Board found that there were sufficient changes in the character of the neighborhood since the adoption of the comprehensive zoning map in January 1957 to justify the Board in granting the reclassification, so that it was not necessary to consider whether or not there had been a mistake in original zoning which would also justify a reclassification under the Maryland "Mistake-Change" rule. We agree with the Board and with the trial court that there were sufficient changes under the applicable rule, and that it is unnecessary to consider the question of mistake in original zoning.[1]

The determination of the Board of proper rezoning or reclassification is essentially legislative in nature. It calls for the zoning expertise of the Board in a special way and the function of the Court upon review is quite limited. We have said many times that it is not the function of the Courts "to zone or rezone," [2] and it is vital to the public interest that this declaration by us be strictly applied; otherwise we will, in effect, substitute our judgment for that of the Board and this we may not do. It is only when the determination of the Board is not "fairly debatable" that we will hold that its action is unreasonable, arbitrary and capricious. *Mothershead v. Board of County Commissioners,* 240 Md. 365, 214 A. 2d 326 (1965); *City of Baltimore v. Borinsky,* 239 Md. 611, 212 A. 2d 508 (1965); *Sampson Bros. (Md.) Inc. v. Board of County Com-*

---

1. There is strong evidence in the case which might well have justified a finding of mistake in original zoning by the failure of the County Council to provide for a recognizable need for apartment zoning in January 1957. Cf. Jobar v. Rodgers Forge Community Ass'n., 236 Md. 106, 121-122; 202 A. 2d 612, 617-618 (1964). Many of the "changes in conditions" possibly reflect, in part, a possible mistake in original zoning, and a precise line of demarcation between the two factors in the rule is difficult, if not impossible, to make. As we have indicated, it is not necessary to pass on this issue of mistake in original zoning, and we make no holding in regard to it. Cf. White v. County Board of Appeals, 219 Md. 136, 144; 148 A. 2d 420, 423 (1959).

2. Dal Maso v. Board of County Commissioners, 238 Md. 333, 340, 209 A. 2d 62, 66 (1965); Jobar Corp. v. Rodgers Forge Community Ass'n., 236 Md. 106, 202 A. 2d 612 (1964); Offutt v. Board of Zoning Appeals of Baltimore County, 204 Md. 551, 105 A. 2d 219 (1954); Wakefield v. Kraft, 202 Md. 136, 96 A. 2d 27 (1953).

*missioners,* 240 Md. 116, 213 A. 2d 289 (1965) ; *Dal Maso v. Board of County Commissioners,* 238 Md. 333, 209 A. 2d 62 (1965) ; *Jobar Corp. v. Rodgers Forge Community Ass'n.,* 236 Md. 106, 202 A. 2d 612 (1964) ; *Rohde v. County Board of Appeals,* 234 Md. 259, 199 A. 2d 216 (1964) ; *Trustees of McDonogh Educational Fund v. Baltimore County,* 221 Md. 550, 158 A. 2d 637 (1960) ; *Offutt v. Board of Zoning Appeals of Baltimore County,* 204 Md. 551, 105 A. 2d 219 (1954) ; *Wakefield v. Kraft,* 202 Md. 136, 96 A. 2d 27 (1953).

What then are the changes in conditions which the Board found to justify the reclassification?

The first and the most important change in the neighborhood of the subject property was the construction of the Beltway. The location or possible construction of the Beltway was not indicated on the comprehensive zoning map when it was promulgated. The condemnation petition to acquire the necessary portion of the Pillbox Farm for construction was filed in 1961 and the Beltway was constructed in that location in 1962. We have already described the astounding effect the construction of the Beltway had on the Pillbox Farm. It cut it into two parts. It destroyed the dwelling house, barn and other outbuildings. It denied access to a substantial portion of the Pillbox Farm to the south of the Beltway which was taken by the State Roads Commission and later sold to the Druid Ridge Cemetery. It prevented the running of sewers down Park Heights Avenue because of the bridge over that road. It completely destroyed the country manor-type use to which the property had been put prior to the construction of the Beltway.

The construction of the Beltway was a far more extensive and important change in conditions, which would make the reclassification fairly debatable, than was the change in conditions resulting from the changes in construction and extension of Stevenson's Lane involved in *Jobar Corp. v. Rodgers Forge Community Ass'n., supra.* In *Jobar,* Stevenson Lane at the time of the adoption of the comprehensive zoning map was a small 12 to 15 foot road and in part a private drive. It was not built in front of the property involved in *Jobar* until approximately two years after the adoption of the comprehensive zoning map. At the time of the filing of the application for the reclassifica-

tion, Stevenson Lane was a fully paved 42 to 44 foot bituminous concrete road, with a 70 to 80 foot right of way. It had become a major traffic artery between York Road and Charles Street and Bellona Avenue. Its construction did not have nearly the profound effect on the *Jobar* property as the construction of the Beltway had on the subject property and the improvement and extension of Stevenson Lane did not result in a highway comparable to the Beltway in the extent of traffic. We held in *Jobar* that the improvement and extension of Stevenson Lane was an important change in conditions. It necessarily follows that we should hold that the construction of the Beltway was an important change in conditions in the case at bar, and we so hold.

The appellants suggest that *Jobar* is to be distinguished from the case at bar because the existing zoning in *Jobar* was R-6 rather than R-20 or R-40 as in the case at bar and the *Jobar* property was in a high density rather than in a low density area. We are of the opinion that this does not impair the applicability of our holding in *Jobar*. Indeed it seems to us that the impact of the Beltway on an area zoned for low density development is probably greater than upon an area zoned for high density.

The appellants also suggest that the county authorities knew of the location of the Beltway in the area when the comprehensive zoning map was adopted on January 16, 1957, whereas in *Jobar*, it had not been settled at the time of the adoption of the comprehensive zoning map whether Stevenson Lane would ever be extended to connect with York Road and Bellona Avenue. The evidence, however, indicates that while the Baltimore County authorities knew that the Beltway was to be located in this general area at the time the comprehensive zoning map was promulgated on January 16, 1957, the plans and the design of the interchanges of Stevenson Lane and Park Heights Avenue with the Beltway were not approved until April 15, 1959 or more than two years later. The Beltway was not actually constructed at the location in question until 1962. As we have already stated nothing appears on the comprehensive zoning map even indicating in outline form the *possible* location of the Beltway. It seems clear that its possible construction was given little, if any, effect in formulating and adopting the 1957 zoning map.

Another substantial change in the area since the adoption of the comprehensive zoning map was in regard to sewer facilities. We have indicated in some detail the situation existing on January 16, 1957 as compared with subsequent actions by the Halles necessary to obtain sewer facilities by obtaining rights of way, acquiring additional property and expending $134,-000.00 for these purposes.

We have heretofore indicated that a change in conditions may be found in new or expanded sewer facilities. See *White v. County Board of Appeals,* 219 Md. 136, 144, 148 A. 2d 420, 423-424 (1959). See also *Rohde v. County Board,* 234 Md. 259, 268, 199 A. 2d 216, 221 (1964).

Then too, there has been a substantial change in the public water supply. In January 1957 this water supply was so inadequate that building construction was restricted at the time of the adoption of the zoning map and these restrictions continued until 1961. In 1962 — five years after the zoning map was adopted—a new 36 inch water main was constructed through the reservoir down Hooks Lane and back to Reisterstown Road at its intersection with Hooks Lane. As we have stated above, this substantial improvement involved 23,000 feet of line and cost approximately $1,250,000. A new pumping station has been erected and a 1,000,000 gallon storage tank has now practically been completed.

In the comprehensive zoning map approved January 16, 1957 no provision was made in this area for apartment development. The evidence indicates that there was a need for such provision at that time and that this need has become increasingly pressing. This need led the Planning Staff and the Planning Board in 1962—five years after the approval by the County Council of the comprehensive zoning map—to adopt "locational criteria" as guides for apartment use of land. Mr. Gavrelis summarized these locational criteria as follows:

"In essence, the criteria which we use currently for locating apartment zoning would evolve around the fact that the apartment building project is on a major thoroughfare, with good accessibility to the area within the region, so to speak, by the road system, or that it is in close proximity to community facilities,

most usually shopping facilities, so that this higher density can take advantage of accessibility features and service features. The Planning Board would also like to see these higher density residential zones, that apartment zoning is within our current context of the regulations, generally at the edge of a residential area rather than in the middle of such an area."

We have already pointed out that in the opinion of the Planning Staff the subject property substantially met these criteria.

The establishment by the Planning Staff and Planning Board of these locational criteria confirms the testimony of the Halles' experts of the increasing need for apartment use and the existing need for high rise apartments in the area of the subject property. These factors are to be considered as evidence of either error in original zoning or a change in conditions justifying reclassification. Chief Judge Brune, speaking for the Court, stated in *Rohde v. County Board, supra:*

"The applicant produced considerable expert testimony to show that either as a result of lack of anticipation of trends of development in 1955 or as a result of changes in trend which have occurred since then, whether anticipated or not, the existing zoning was in error at the time of the hearing. The trend has been towards apartments and, particularly in areas close to the City of Baltimore, towards high rise apartments. The need and demand for such rental accommodations have increased greatly over the last several years, and the subject property is described as a prime site for apartment development, including high rise apartments." (Pages 267-268 of 234 Md.; pages 220-221 of 199 A. 2d).

The case at bar is to be distinguished from *Hewitt v. County Commissioners of Baltimore County, supra,* in which the Baltimore-Harrisburg Expressway was shown on the comprehensive zoning map, had been constructed, and had been relied on by the zoning commissioner, as well as by the Planning Staff and the Planning Board in their recommendations to the County

Commissioners. In the case at bar the Beltway is not even shown on the comprehensive zoning map as a proposed highway.

Because of the changes in conditions mentioned we cannot say that the reclassification was not fairly debatable. It follows that the action of the Board in reclassifying the subject property was not arbitrary, unreasonable or capricious and the portion of the trial court's order affirming this action by the Board should be affirmed.

The trial court, however, was in error in reversing the Board's order granting the special exception to erect the elevator apartments. The factors to be considered by the Board are set forth in Section 502.1 of the Baltimore County Zoning Ordinance. These factors are substantially the same as those set forth in *Oursler v. Board of Zoning Appeals,* 204 Md. 397, 401, 104 A. 2d 568, 569 (1954).

In considering the special exception, the Board acts as a body of zoning experts and the area of judicial review is quite limited. As Judge Delaplaine, for the Court, aptly stated in *Oursler, supra*:

> "The function of a zoning board is to exercise the discretion of experts, and the court on appeal will not disturb the board's finding where it has complied with the legal requirements of notice and hearing, and the record shows substantial evidence to sustain the finding." (Page 405 of 204 Md.; page 572 of 104 A. 2d).

See also *Rohde v. County Board, supra,* at page 267 of 234 Md., page 220 of 199 A. 2d.

It is clear to us that the evidence before the Board—much of which has already been set forth—was substantial evidence from which the Board could find that proposed elevator apartments would not be detrimental to the health, safety or general welfare of the locality involved, would not tend to create congestion in roads, streets or alleys therein or create any hazard from fire, panic or other dangers, would not tend to overcrowd land or cause undue concentration of population, or interfere with adequate provisions for schools, parks, water, sewerage, transportation or other public requirements, conveniences or improvements or interfere with adequate light and

air. Indeed in this regard, the evidence in the case at bar is stronger in support of the granting of the special exception by the Board than was the evidence we held sufficient for such support in *Oursler* or in *Rohde.* The Board's order granting the special exception should also have been affirmed.

> *Order of December 22, 1964 affirmed in part and reversed in part and case remanded for the entry of an order in accordance with this opinion, the costs to be paid by the appellants.*

HAMMOND, J., filed the following dissenting opinion.

Judicial acquiescence in an agency's perversion of the zoning process has constrained me to dissent. The Board of Zoning Appeals, in reclassifying the Halle property misconstrued its basic and fundamental function and place in zoning, and the affirmance of its action by the Court of Appeals will perpetuate its misconceptions and so foster bad zoning at the expense of good.

The strong presumption of the correctness of original zoning and comprehensive rezoning led the Court of Appeals to the now firmly established rule that piecemeal or individual change can validly be made by a zoning board or agency only if there is presented to it strong evidence either of mistake in the basic zoning or of a substantial change in the character of the neighborhood. In the instant case a consideration of the testimony before the Board and its opinion makes it entirely apparent that the Board granted the request for rezoning for high-rise apartments because it thought the Halle site was an appropriate place (an "ideal site") for elevator apartment buildings under the criteria of the Planning Board which were established two years after the comprehensive rezoning and felt there was need for such apartments in that part of the County, and that it justified the effectuation of its beliefs and feelings by finding "changes" that simply had not occurred or are not changes at all.

Mr. Gavrelis of the Planning Staff of Baltimore County testi-

fied that the "subject property comes closer to meeting the locational criteria established by the Planning Board in locating apartment zoning than have other recent requests for apartment zoning elsewhere in this area * * *," although he testified further that he and the Planning Staff found neither original error in the zoning map nor substantial changes in the physical character of the neighborhood.

In light of the views of the Planning Board, if the Halle property had been rezoned for apartment use as part of a comprehensive rezoning, either in 1957 or subsequently, there could be no just complaint that this was not appropriate and sound zoning, made with a view to and a consideration of the overall good and needs of that part of Baltimore County community and the property rights of the owner. But the Board of Appeals was not created to rezone piecemeal as if it were zoning originally or rezoning comprehensively. Suitability of a site for a particular use and a general need for that use are all important in basic comprehensive zoning but they are not controlling, or indeed properly persuasive, in determining under the purposefully restricted standards of original error or subsequent substantial change whether a reclassification of that site legally can be granted. To the Board of Appeals, as experts, has been confided the delegated function of determining whether there has been presented to it strong evidence of original error or substantial change. Its expertise is to be devoted only to deciding these two questions, not to the exercise of land planning and comprehensive rezoning. Just as war has been said to be too important to be left to the generals, so original zoning or comprehensive rezoning (in the guise of individual rezoning or otherwise) is far too important to be confided to a rezoning board or to any body except the elected legislative representatives of the people, acting in the exercise of the full plenary legislative powers confided to the municipality. The right and power of the Board to make individual reclassifications is to enable the rectification of mistakes, original or subsequently developed, which a reasoning mind reasonably could find to have been proven and which have made the classification of the particular property incompatible with that of the adjacent or close community, so that its use under its existing classi-

fication would be inappropriate and inharmonious in relation to the other actual uses in the neighborhood. The Board of Appeals cannot lawfully rezone to accomplish what it thinks would have been more desirable original planning and zoning or what it thinks good comprehensive replanning and rezoning would achieve or to permit the highest or best or most profitable use of land, yet this is precisely what it has done in the instant case with the judicial blessing of the Court of Appeals, and a seamless web has been torn.

It can be demonstrated that no substantial change in the character of the neighborhood occurred since 1957. (There is no real claim of original error.) There can be no doubt that the location of the Beltway was fully known to and considered by the County Council in 1957 when it adopted the Third District map. Only the locations of the access and exit ramps for Park Heights Avenue and Stevenson Road were then undetermined. Knowing that the portion of the Halle land now involved would be north of the Beltway, the Council kept it zoned R-40 and R-20. Beyond question a wide busy road like the Beltway is a natural dividing line between land zoned for individual homes and land zoned for more intensive uses, both in fact and in law. "It would be difficult, to say the least, to think of a more logical line of demarcation between the industrial and commercial zones to the east and the residential zone to the west of this barrier [Harrisburg Expressway]." *Hewitt v. Baltimore County,* 220 Md. 48, 60; *Kaslow v. Rockville,* 236 Md. 159. In *Stocksdale v. Barnard,* 239 Md. 541, 548, we said in reference to the same situation on York Road:

> "In *Shadynook Imp. Assn. v. Molloy,* 232 Md. 265, 192 A. 2d 502, we held that the existence of apartment uses on one side of the street does not alter the use of the land on the opposite side [for individual homes], and therefore the street is an appropriate line of demarcation."

*Woodlawn Area Citizens Association, Inc. v. Board of County Commissioners for Prince George's County,* 241 Md. 187.

The fact that part of the Halle tract was taken—at a full price—for Beltway use does not change the character of the

part remaining or of other adjacent and nearby land north of the Beltway. All such land north of the Beltway on both sides of Park Heights Avenue still remains wooded and undeveloped, except by occasional individual homes on large lots. One has only to drive the Beltway to know that hundreds of individual homes line both sides of it in various areas, and its presence does not necessarily change the character of abutting land from that devoted to individual residences to more intense uses. There are no unusual circumstances here that would alter this general rule and make the Beltway, of itself, constitute a change in conditions. See *MacDonald v. County Board,* 238 Md. 549. See also *Greenblatt v. Toney Schloss,* 235 Md. 9.

The availability of a public water supply and of sewerage are not changes in the character of the neighborhood. They may permit use of the property for apartments, a fact which would be of significance in considering rezoning as part of a comprehensive change, but they do not change the character of the neighborhood as one suitable for devotion to individual homes, and thus are not significant in determining individual change. Individual homes need and use water and sewerage. *MacDonald, supra.* Availability of public water and sewerage makes the Halle site potentially more profitable and is analogous in this respect to the need for apartments claimed by the applicants for rezoning. "That there may be a need for additional apartments in this immediate vicinity * * * fails to show anything more than that an R-A use would be more profitable than an R-6 use * * *," *Shadynook Imp. Assn. v. Molloy,* 232 Md. 265, 272; "a mere increase in population does not prove a change in the character of the neighborhood to justify another type of zoning," *County Comm'rs v. Fairwinds,* 230 Md. 569, 572. See also *Pahl v. County Bd. of Appeals,* 237 Md. 294.

The comprehensive rezoning by the Board, unsupported by any evidence of original error or subsequent substantial change in the character of the neighborhood should have been reversed. I agree that Judge Turnbull had no basis for denying the special exception the Board granted for elevator apartments.