## BETH TFILOH CONGREGATION OF BALTIMORE CITY *v.* BLUM ET AL.

[No. 255, September Term, 1965.]

*Decided March 29, 1966.*

The cause was argued before HAMMOND, HORNEY, MARBURY, BARNES and McWILLIAMS, JJ.

*W. Lee Harrison,* with whom was *Melvin J. Sykes* on the brief, for the appellant.

*Edward C. Covahey, Jr.,* and *J. Elmer Weisheit, Jr.,* with whom was *Arnold Fleischmann* on the brief, for the appellees.

McWILLIAMS, J., delivered the opinion of the Court. HAMMOND, J., concurs in the result.

Unless forewarned, no Maryland lawyer whose practice embraces zoning matters would be able to read this opinion and the briefs without experiencing a feeling of déjà vu. Eventually, however, the familiar names, places, and principles of law would fall into place and the reader then would realize that, in reality, he was revisiting *Finney v. Halle,* 241 Md. 224, 216 A. 2d 530 (1966). The property in the case at bar is less than a mile to the east of the Halle property. Both properties are in the 3rd Election District of Baltimore County and both abut the Baltimore Beltway. The zoning classification sought was the same in each case. The same attorneys opposed each other. The same witnesses (with minor exceptions) testified in both cases. The Board of Appeals rezoned both properties for substantially the same reasons. In each case there were appeals first to the Circuit Court for Baltimore County and then to this Court. And, oddly enough, although our decision in *Halle* was filed several months ago (2 February 1966), it was not heard by the Board of Appeals until about a month after the instant case.

For many years the focal point of the activities of the Beth Tfiloh Congregation was its synagogue in the Forest Park section of Baltimore City. It is an Orthodox congregation with 800 contributing members but actually ministering to about 2,000 families. In addition to the synagogue there is a school, a community center and (at another location) a cemetery. In recent years many members of the congregation have migrated

to the suburbs. Most of them have settled in the 3rd Election District of Baltimore County. As Rabbi Rosenblatt put it, "every week people are moving away from us." To serve the needs of those who had already moved and as well the needs of those who will surely follow it was decided to move the synagogue and its associated activities to Baltimore County. The necessary land was purchased in 1961. Containing 57.25 acres it extends north from Old Court Road to the Beltway. Immediately adjoining to the west is the development known as Dumbarton Heights. The land along the eastern boundary is undeveloped.

Proceeding with dispatch the congregation engaged the services of Morris Lapidus, a distinguished American architect with an international reputation. He was directed to design a synagogue complex consisting of a sanctuary, a school, a social center, a library, and housing complex. At first he was asked to suggest how the property might be utilized, in respect of housing, within the existing zoning (residential), which he did, but later on it was decided that the optimum use of the land required apartments, both high rise and low rise.

On 21 March 1963 the congregation entered into a contract of sale with a Maryland corporation named The Two Hills Development Company, which is the alter ego of Gordon E. Sugar, the developer of Dumbarton Heights. This rather unorthodox agreement provides for the sale of the northernmost 20 acres (the subject matter of this appeal) of the property. The synagogue complex, now under construction, is on the southernmost 37.25 acres. The purchase price is stated to be $480,000, but this is subject to escalation depending on the number of apartment units ultimately permitted to be constructed. Sugar is *required* to employ Morris Lapidus as his architect and Matz, Childs & Associates (also employed by the congregation) as his engineers. Sugar is *required* also to give members of the congregation a limited priority over the general public in the leasing of the apartments. The agreement contains many other limitations and restrictions all of which are calculated to insure the utmost compatibility between the apartment complex and the synagogue complex in respect of roads, streets, water, sanitary sewers, storm drains, utilities, location of buildings, architectural design, and building materials.

As required by the contract, the congregation sought to have the zoning classification of the 20 acre parcel changed from R.20 and R.40 (residence, one family) to R.A. (residence, apartment). Application was also made for a special exception to construct a "high-rise" (elevator type) apartment building. On 25 September 1963 the Zoning Commissioner denied both the request for reclassification and the application for the special exception. Prompt appeals to the Board of Appeals were entered. On 17 and 18 March and on 29 April 1964 the Board heard the testimony of a number of witnesses and on 25 June 1964 its decision was filed. The rezoning was granted but the special exception was denied.

In his testimony before the Board, Rabbi Herman N. Neuberger, the director of Ner Israel Rabbinical College, pointed out that the adherents of Orthodox Judaism, such as the members of the Beth Tfiloh Congregation, are guided in their religion and in their communal and private lives by the codes expressed in the Shulchan Aruch Orach Chayim and that one of the rules embodied therein prohibits riding to the synagogue on the Sabbath and the high holidays. Rabbi Rosenblatt testified that, while obedience to the rule, held in high regard by Orthodox Jews, was impossible for a great many of his people, there were many who would happily abide by it if they could live within practical walking distance of the synagogue. He observed that "the people who love the synagogue most and love to attend regularly are mostly retired and many * * * are not well. * * * If they had living quarters right near the synagogue it would be a godsend to them." However, he added, the building of individual homes on the property, under R.20 and R.40 zoning, would provide living quarters for so few that it could not be considered a solution of the problem. "The only way [he concluded] is having high rise apartments * * * right near the synagogue."

We shall assume, at least as far as the case at bar is concerned, that the plans for the high rise apartment building have been abandoned since there is no appeal from Judge Raine's affirmance of the Board's denial of the application. At the time of the hearing before the Board, Mr. Lapidus contemplated a high rise building containing 144 units and a group of garden type low rise buildings containing 216 units. It would appear

that at least 60 to 70 additional low rise units can be built in the area initially set aside for the high rise building. Appellees complain that the reclassification of the property to R.A. would enable the congregation to provide quarters for 850 persons whereas under the present zoning only a maximum of 103 can be accommodated. But this, of course, is precisely what motivates Rabbi Rosenblatt and his congregants because as they see it 850 persons walking to services in the synagogue is a greater good than a mere 100 or so doing the same thing.

Based on testimony much the same as the testimony produced in *Halle,* and by virtually the same witnesses, the Board of Appeals found "that there have been extensive changes in the neighborhood not the least of which are those connected with the development of homes, the construction of synagogues and schools (not only Beth Tfiloh but others as well), *the present availability of utilities,* [and] *the opening of the Beltway together with its access roads * * *.*" (Emphasis supplied.) The board cited as additional evidence of change in the character of the neighborhood "the needs and desires of the Beth Tfiloh Congregation to accommodate its members."

Judge Raine, in his opinion, indicated that the appeal had given him a great deal of trouble and after concluding "that the decision of the * * * Board * * * should be reversed * * * [he] confess[ed] that the matter * * * [was] not free from doubt, * * *." He recognized that there had been "an extension of utility lines for water and sewage into the area" but, although he said he was aware of our holding in *Rohde v. County Board,* 234 Md. 259, 199 A. 2d 216 (1964), it seemed to him "that this * * * [was] not sufficient evidence of a change. * * * It makes it possible [he continued] to use the particular property in a way that was not hitherto possible, but certainly, on the surface, it does not change the character of the neighborhood." He conceded that the Beltway "certainly did have a real impact" on the property, "* * * [and that it] has changed the entire Baltimore County from the standpoint of living arrangements." Its impact on shopping arrangements, he added, was "terrific" and finally that "it has revolutionized all types of transportation, * * *." But, he said, "I do not believe that from a legal point of view that this is the kind of

change that the Court of Appeals talks about when they say that change must be present in order to justify reclassification." Judge Raine concluded his opinion by expressing the hope that this Court "might some day" hand down a "real definitive ruling" on "what the real effect is of water and sewer extension * * * and the Beltway on zoning." His closing sentence reminds us (as if we need reminding) that "these cases are constantly plaguing the courts and the position of the trial court is certainly not a happy one."

Whether Judge Raine, on 14 June 1965, the day he filed his able opinion, was right or wrong, in the light of decisions then extant, is a question which, we are pleased to observe, need not be answered. We believe, however, that he might have reached a different conclusion if, at that time, our decision in *Halle* had been available to him. We think Judge Barnes, who wrote the Court's opinion in *Halle*, provided the "definitive ruling" Judge Raine hoped for. In respect of the Beltway he said:

> "The *first* and the *most important change* in the neighborhood * * * was the construction of the Beltway."
>
> * * *
>
> "The construction of the Beltway was a *far more extensive* and *important change* in condition, *which would make the reclassification fairly debatable,* than was the change in conditions resulting from the changes in construction and extension of Stevenson's Lane involved in *Jobar Corp. v. Rodgers Forge Community Ass'n* [236 Md. 106, 202 A. 2d 612 (1964)]. * * * Its [Stevenson's Lane] construction did not have nearly the *profound effect* on the *Jobar* property as the construction of the Beltway had on the subject property and the improvement and extension of Stevenson Lane did not result in a highway comparable to the Beltway in the extent of traffic. * * * *It necessarily follows that we should hold that the construction of the Beltway was an important change in conditions* in the case at bar, and we so hold." 241 Md. at 237-38. (Emphasis supplied.)

In respect of the increase in water and sewer facilities, Judge Barnes went on to say:

> "Another *substantial* change in the area since the adoption of the comprehensive zoning map was in regard to sewer facilities."
>
> \* \* \*
>
> "Then too, there has been a *substantial* change in the public water supply." *Id* at *239.* (Emphasis supplied.)

While the Beltway and the extended sewer and water services impinge on the Beth Tfiloh property in a manner somewhat different from the Halle property the impact, we think, is nonetheless substantial. The Board of Appeals cited as additional evidence of changes in the neighborhood "the needs and desires of the Beth Tfiloh Congregation to accommodate its members." However relevant and probative this evidence may be, the court below made no mention of it and we do not find it necessary to do so. Since what we said in *Halle, supra,* seems especially applicable here, we think its repetition is pertinent:

> "Because of the changes in conditions mentioned we cannot say that the reclassification was not fairly debatable. It follows that the action of the Board in reclassifying the subject property was not arbitrary, unreasonable or capricious and the \* \* \* action by the Board should be affirmed." *Id* at 241.

There was much argument in the briefs (and orally) on the question of error in the comprehensive rezoning of 1957. The Board of Appeals found there was such an error. Judge Raine, on this point, held to the contrary. Since it is unnecessary for us to do so we reach no conclusion in this regard.

The order of the trial court will be reversed and the appellees will pay the costs.

*Order reversed. Costs to be paid by appellees.*

HAMMOND, J., concurs in the result.