RONALD B. DUSTIN for ROCKLAND PARTNERS *v.*
MAYOR AND COUNCIL OF ROCKVILLE

[No. 89, September Term, 1974.]

*Decided November 18, 1974.*

The cause was argued before ORTH, C. J., and THOMPSON and MENCHINE, JJ.

*Joseph A. Lynott, Jr.,* and *David E. Betts,* with whom were *Lynott & Craven* and *Betts, Clogg & Murdock* on the brief, for appellant.

*Roger W. Titus, City Attorney,* and *Paul T. Glasgow, Assistant City Attorney,* with whom was *Vincent E. Ferretti, Jr., Assistant City Attorney,* on the brief, for appellee.

MENCHINE, J., delivered the opinion of the Court.

Although this "case of the eternal triangle" does not involve domestic relations, it has engendered discussion, heat and litigation of equal or greater intensity than such cases.

At issue here is the zoning fate of a roughly triangular parcel of land (65,296 square feet) that had been zoned I-2 (Light Industrial) from 1957 until rezoned to R-75 (Single Family Residential) on May 21, 1973. It was the last remaining unused, undeveloped part of industrial land of substantial acreage adjoining the residential development known as "Twin Brook," in the City of Rockville. At the time of initial zoning, the triangle was attached to and formed an integral part of the larger industrially zoned parcel. When originally zoned, that parcel had a limited actual industrial use. One portion then was in use by a propane gas company; a second by a plant manufacturing wooden screens. The latter facility was destroyed by fire and not replaced. Although the industrial area developed slowly in the course of years following 1957, by 1973 it had become substantially fully utilized for industrial purposes, principally in warehousing enterprises.

When annexed to the City of Rockville in 1957, the residential development of Twin Brook was substantially complete as a community of moderate cost homes. Fifteen dwellings have been added since 1957, so that few, if any, lots remain undeveloped within it. In short, from the time of

original zoning actual development within the neighborhood overwhelmingly has been, both in the residential and industrial zones, in accord with the zoning originally applied to it. The single exception was the zoning change of a small lot from I-2 to R-75. That lot lay to the south of the subject property across Rockdale Avenue but on the same side of Lewis Avenue as the subject. The uncontradicted evidence, however, showed that the extension of those two streets made the last mentioned lot incapable of industrial use because of its size and shape.

At the time of initial zoning Lewis Avenue came to a dead end at the northern boundary of the industrially zoned land. Principal access to that land then was provided by Halpine Road, a street forming its southern boundary. At the western boundary of the industrially zoned land were the tracks of the Baltimore and Ohio Railroad. The zoning of the land lying west of those tracks was I-1 (Heavy Industrial). Further to the west, the land was zoned for commercial use.

In the course of the years two changes in the road pattern occurred. First, Lewis Avenue, extended to intersect Halpine Road, was constructed as an industrial road substantially wider than its counterpart to the north; secondly, Halpine Road was terminated at the point where formerly it had crossed the tracks of the railroad, apparently because of train-motor vehicle collisions at that grade crossing. The latter change had a twofold effect: (a) it prevented the movement of industrial traffic to the west across the railroad tracks toward arterial highways existent in that direction, and (b) it compelled the movement of such traffic through the roads of the Twin Brook residential community. These changes were brought about in 1965 or earlier, substantially prior to completion of the new industrial expansion taking place on the west side of Lewis Avenue as extended.

Exhibit B showed the nature of the neighborhood as it existed in 1957 when initially zoned. Exhibit A showed the substantially complete development of the area on the date of the last hearing on May 15, 1973. We reproduce parts of those Exhibits for clearer focus upon the issues presented here.

Hatched area indicates I-2 zoning and street pattern existent at time of hearing in May, 1973. Subject tract shown as in other exhibit. Cross-hatched area indicates I-2 area rezoned to R-75 by an owner's prior petition.

Hatched area indicates I-2 zoning and street patterns existent in 1957. (Subject parcel, roughly triangular, shown within broad lines at upper right of I-2 tract.) Unhatched areas north of Halpine Road and East of railroad tracks indicate R-60 zoning.

The extension of Lewis Avenue had caused the subject property to be severed from the larger industrial tract. The coupling of an extension of Rockland Avenue into Lewis Avenue created a second parcel separation from the I-2 zone. The latter (shown cross-hatched on Exhibit A) was the subject of the only reclassification made in the entire neighborhood in the years between 1957 and 1973. Two dwellings facing the center of the industrial area on the other side of Lewis Avenue were constructed on that lot.

The years following the extension of Lewis Avenue and the closing of Halpine Drive found the subject land lying idle, serving only as a place of play for the children of the community. Many residents of Twin Brook made clear that it was their desire that the subject tract continue to serve the community as a small park. Indeed, the record shows that the residents urged the city fathers to negotiate attempts to acquire the tract for park purposes. Negotiations were undertaken but failed to achieve that result.

Such was the background of the subject tract in July, 1972 when its owner, Ronald B. Dustin, a co-partner on behalf of Rockland Partners, a partnership, entered into a contract with Berger/Berman Buildings, Inc. for its sale. The sale price of $134,000 was made contingent upon: (a) issuance of a use permit for the construction of a warehouse facility; and (b) grant of a building permit for such construction. Residents of the community quickly gained knowledge of the proposed use of the land. Immediate efforts were taken by resident associations to effect a zoning change that would prevent use of the land for industrial purposes. Letters of protest were written by aggrieved residents. One, written by Richard R. Haight as chairman of the Twin Brook-Rockcrest Neighborhood Advisory Council, was addressed to the Mayor and Council of Rockville, dated August 21, 1972, advising the municipal corporation that the citizens association desired to apply for rezoning. He requested waiver of the filing fee generally required.

On September 14, 1972 the municipal corporation responded as follows:

"The Mayor and Council, at its meeting on September 11, 1972, discussed the request of the Twinbrook-Rockcrest Neighborhood Advisory Council for the waiver of the fee in connection with application for rezoning of a plot of ground known as lot 1, block C, Halpine subdivision. Councilman Northway reported that the Planning Commission had considered this particular rezoning and had decided to delay action until the results of the down zoning case[1] now before the courts is known.

"It was the consensus of the Council that it would be unwise to wait for the pending case to be decided and that action should be taken on the rezoning in Halpine as soon as possible. The Planning Commission is being requested, therefore, to move ahead on this matter and file the rezoning application on the behalf of the Twinbrook-Rockcrest Neighborhood Advisory Council. With the Planning Commission as applicant, there would be no fee involved."

On September 19, 1972 the City of Rockville Planning Commission filed Application M-226-72, seeking reclassification of the subject property from the I-2 (Light Industrial) zone to the R-75 (One-Family Detached Residential) zone. The application stated *inter alia*:

"This reclassification is sought by reason of — mistake in the original zoning [2] — other reasons set forth below.

"The following is a concise statement of the facts and circumstances upon which the Applicant relies to justify the reason(s) set forth above for this reclassification:

The subject property was vacant and sur-

---

1. An apparent reference to *Mayor and Council of Rockville v. Stone*, 271 Md. 655 (Decided May 22, 1974), 319 A. 2d 536.

2. The words "change in character of the neighborhood" also appeared on the printed application form but had been struck out prior to its submission to the Mayor and Council.

rounded on three sides by residentially-zoned and used land at the time of the adoption of the existing zoning classification. Such action was contrary to the preservation and promotion of the public health, safety and welfare and detrimental to the use and enjoyment of the surrounding residential land."

Although the application for rezoning had been instituted by the Planning Commission, its rejection was recommended by the planning staff. The planning staff on November 14, 1972 directed a memorandum to the Planning Commission that declared *inter alia*:

*"The recommendation of the Planning Commission*: The existing zoning on the subject property resulted from the comprehensive Zoning Map and Ordinance adoption of 1957 and was a carry-over from the previous zoning map. There may have been an error in the placement of this and other properties on the industrial zone. Little justification can be found, in retrospect, for an action placing this area in an industrial zone, particularly since the only industrial use, at this time, was at Halpine Avenue, and no additional access was contemplated. However, the substantial change in the *developed* character of the industrially-zoned portion of the neighborhood since that date, i.e.: construction of an industrial access road and total industrial development of the southeast side of Lewis Avenue, militates very strongly against changing the zone classification at this point in time.

"Another area of concern here, particularly for those living in the area, is that of further change in the neighborhood, if the subject parcel develops industrially; this is seen by residents as leading to additional industrial zoning requests on adjacent residential lots; a situation that has existed and been difficult to check in the Stonestreet Avenue area. The Stonestreet Avenue area was likewise

probably a 'mistake' in zoning; however, the 'change in character' of that area has been the overriding factor in judgments leading to industrial zoning changes. Rezoning the subject property to residential, of course, would not guarantee that pressures could not still develop for zoning changes in the Lewis Avenue area in the future; other properties, presently developed residentially, may become attractive to industrial speculators.

"It appears that any argument for granting the reclassification as requested will necessarily be a weak one, given the zoning and development history of the area. Industrial use of the subject property, with the controls placed upon it by the Ordinance and additional amenities added at the Planning Commission's discretion, can assure a development that will not, in our judgment be detrimental to the neighborhood, nor create a condition greater than currently exists as argument for further industrial encroachment in the area. We cannot conclude, or advise the Commission, that the available evidence supports reclassification as sought by M-226-72."

The adverse recommendation of the planning staff did not dissuade the Planning Commission. At its meeting on November 15, 1972, the Planning Commission, by a divided three to one vote,[3] thus stated the conclusions of its majority:

"1. The original zoning, dating from the time of annexation prior to 1957, and restated at the time of Zoning Ordinance and Zoning Map adoption (October 1, 1957) was a mistake; this property, and others in the City at the south end of Lewis

---

3. Commissioners Quinn, Humphrey and Northway (the latter also a member of the Rockville Council) constituted the majority; Commissioner Whitlock cast the negative vote, declaring that she did not believe that the requisite evidences for reclassification were present in sufficient strength to warrant approval.

Avenue, should have been originally classified as residential, not industrial land.

"2. The subject property is the only part of the original industrially-zoned land, described in #1 above, which is *east* of Lewis Avenue and has remained in the I-2 zone since that time (another, smaller parcel east of Lewis Avenue was rezoned from I-2 to R-75 by its owner, several years ago, for residential development). Because it is therefore the single most intrusive segment, into the existing developed residential neighborhood, of that which was originally mistakenly classified it represents the most severe threat to that neighborhood if developed in its present zone. The threat is not, in the Commission's judgment, only that of the intrusion into the neighborhood of a dissimilar and incompatible use, but also of the risk and incentive it would present for speculative transfer of developed residential properties, diminution of property maintenance, pressures for residential-to-industrial reclassification, and subsequent further industrial encroachment into the neighborhood. This would be to the detriment of that neighborhood, and would represent the loss of existing moderate-income housing, a valuable and largely irreplaceable commodity."

In the meantime, the property owner's application for a use permit for the property under its I-2 zoning had run into stormy weather. The planning staff on November 1, 1972 recommended its grant. The use permit was withheld by the Planning Commission, however, with the property owner being advised on November 30, 1972, " * * * that the Planning Commission will not take action on the referenced application, for an industrial use of Lewis Avenue and Rockland Avenue, pending a decision by the Mayor and Council on map amendment application M-226-72 affecting the same property."

With the stage so set, the public hearing began on

December 5, 1972.[4] It became apparent at the outset that the dispute between the planning staff and the Planning Commission had not been resolved. The proceedings were opened with a statement of Michael J. Bathke, Acting Director of Planning for the City of Rockville, making it crystal clear that although he was acting as spokesman for the Planning Commission and was attempting as best he could to present the Commission's viewpoint that the reclassification should be granted, his professional views were to the contrary. As a planning expert he declared that he shared the views expressed in the staff recommendation that reclassification should be denied. Because we have detailed the staff recommendation we believe it unnecessary to set forth at length his testimony supporting his personal views, beyond a summary that he felt that the available evidence did not support reclassification.

Sixteen community residents testified as proponents of the Planning Commission's application. Their testimony in large measure consisted of expressed desires that the subject land continue to serve community uses as a park or playground for children and of generalized expressions of fear that industrial use of the property would harmfully affect traffic conditions and endanger the safety of their children.

A former Mayor of Rockville contended that industrial use of the subject property would thrust a wedge-like intrusion into the residential community. Other witnesses stressed the severance of the subject tract by the extension of Lewis Avenue, pointing out that a smaller separated tract lying to the south of the subject had been reclassified from I-2 to R-75 zoning, and suggesting that this was a change in the character of the neighborhood such as would justify the proposed reclassification (although applicant had not sought

---

4. Section 6-2.30 of the City of Rockville Zoning Ordinance (enacted pursuant to authority granted by § 4.01 of Article 66B of the Annotated Code of Maryland) provides that applications for a zoning amendment shall be filed with and determined by the Mayor and Council of Rockville. The ordinance authorizes the filing of such applications by the Planning Commission.

reclassification on that ground). Acting Director of Planning Bathke countered these contentions by saying:

"* * * since it has been our position for a very long time that the least objectionable relationship between dissimilar uses, physical relationship, is a back or side to side or rear to rear relationship, not a fronting relationship across a street serving dissimilar uses, it was our judgment that on balance, the rigorous application of the laws which now obtain in the community would present at least the possibility of lesser intrusion in the development of this property in its present zoning than would be visited on residential use of this same property by the fact of existing industrial development across the street that cannot serve as a buffer."

The former mayor declared that he could not honestly recommend R-75 rezoning, suggesting as an alternative a higher density zone for residential use such as R-40 or R-60.

Numerous witnesses urged that the traffic engendered by industrial use of the subject property would so affect the public welfare as to justify the requested rezoning. None supplied figures supporting that generalized opinion.

The property owner, opposing proposed reclassification of the land, offered Thomas G. Oyster as a witness. He had been engaged for many years in development and planning activities. He had qualified as an expert in the courts of Montgomery and Prince George's Counties, and before the Mayor and Council of Rockville and other zoning bodies in cases involving zoning and planning. He expressed the professional opinion that the property could be well-developed in harmony with the community within its I-2 zoning. He declared that restrictions required to be imposed by the Planning Commission before the grant of a use permit would compel such screening of the property as would furnish adequate protection to the single family residences facing it. He countered the witness Ontko's opposition to utilization of the subject tract for industrial

purposes by pointing out that Ontko conducted a "semi-commercial" enterprise in the operation of a swimming pool on his lot and declared that the required screening would also "cut out Mr. Ontko's dog pen and any runs, and any activities he may have in his swimming pool."

The traffic question was the subject of but three specific official or expert comments, namely:

1. The comment of the planning staff:

> "*Present and future transportation patterns*: Lewis Avenue is classified as a 'secondary industrial' road between this lot and Halpine Road to the southeast. It was constructed to that standard during the 1960's to service this parcel and other industrial lots across the street. Rockland Avenue is a 'secondary residential' road, and access is not permitted to the subject property via Rockland in its present zone. The existing streets are adequate to serve development in the R-75 zone."

2. The report of the Traffic Engineer of the Planning Department:

> "There are no legal means whereby we could prohibit this traffic from using Lewis Avenue, since it will have Lewis Avenue as its destination. There are only two possible routes for the industrial traffic to use to reach this location: Lewis Avenue from the north, or Ardennes Avenue, Halpine Road, and Lewis Avenue from the south. If we discourage this traffic from using Lewis Avenue from the north, we will possibly overburden Halpine Road and Ardennes Avenue, both of which are also residential streets. In fact, the only way we could discourage truck traffic from using Lewis Avenue north of Rockland Avenue would be to post 'No Thru Trucks' signs. These signs would not be enforceable, and would only serve to lure the residents into a false sense of security, increase complaints to the County Police regarding

violations of the signs, and antagonize the owners and drivers of the industrial traffic.

"*If it is so important that no additional industrial traffic be allowed* on Lewis Avenue, then perhaps the subject building should not be authorized." (Emphasis added.)

3. The opinion of Oyster:

"* * * I think it would be reasonable to anticipate 100 vehicles a day, and on a 10% maximum basis, it would be 10-12 vehicles at peak load, which would be infinitesimal in adding to the roads, particularly to a 48 foot industrial road. I would suggest that the traffic could be directed southeasterly down Lewis Avenue to Halpine Road and then out to the other road." [5]

We find that there was, quite literally, no evidence whatever of a mistake in original zoning—the only ground asserted as justifying the proposed reclassification. The extension of Lewis Avenue and the closing of Halpine Road plainly did not establish a mistake in original zoning. There was no showing that either action had been proposed or planned—but overlooked—by the zoning authorities *at the time of original zoning.*

In *Pattey v. Board of Co. Commrs.*, 271 Md. 352, 317 A. 2d 142, it was said at 361 [147]:

"As we have indicated, the conclusions of the trial judge on the issue of 'mistake' were unsupported by evidence of any kind presented at the zoning hearing, much less by any expert testimony. To support a zoning reclassification, there must be evidence before the legislative body which establishes that the 'mistake' was 'basic and actual'; and that it was made '*at the time*' the property was zoned, which in this case would have

---

5. It will be observed that the comment of the planning staff did not suggest that existing streets were inadequate to serve development under I-2 usage. Significantly the report of the Traffic Engineer likewise did not do so.

been at the time of the original zoning in 1965. *Surkovich v. Doub*, 258 Md. 263, 271, 265 A. 2d 447 (1970); *Miller v. Abrahams*, 239 Md. 263, 266, 211 A. 2d 309 (1965) (emphasis in original). Furthermore, the 'mistake' alleged to have occurred must relate to the *specific property* for which the rezoning is sought, and may not consist of generalities, see *Surkovich v. Doub, supra* at 272."

It is plain that the totality of the evidence presented in connection with application M-226-72 would not sustain the requested reclassification upon the ground of mistake.

The case does not, however, end at this point. After testimony at the hearing on December 5, 1972 had been concluded, a question was raised as to whether the property had been properly posted prior to hearing. At that point the Mayor declared, "I would like to have the City Attorney review the facts with regard to the alleged defects in the posting and let the Mayor and Council know what, if any, legal effect that ought to have on our deliberations." On January 19, 1973 the City Attorney forwarded to the Mayor and Council a memorandum declaring, *inter alia*, "* * * it is the opinion of this office that the inability of the applicant to make the required affidavit [as to posting] is a jurisdictional defect that deprives you of jurisdiction to further consider this application. It will be the recommendation of this office that the applicant be allowed to withdraw the pending application without prejudice, and to file it over again." At its meeting on February 21 the City of Rockville Planning Commission voted to withdraw M-226-72. The application was in fact withdrawn on February 22, 1973.

On the same date a new application bearing No. M-233-73 was filed by the City of Rockville Planning Commission. The new application for reclassification from I-2 to R-75 was identical to the former in every respect save the ground asserted for the grant of reclassification. The new application thus declared the reason:

"This reclassification is sought by reason of —

change in character of the neighborhood — other reasons set forth below.

"The following is a concise statement of the facts and circumstances upon which the Applicant relies to justify the reason(s) set forth above for this reclassification:

At the time this property was placed in the I-2 Zone it, and surrounding land was vacant. All surrounding land on the east side of Lewis Avenue has subsequently changed to be developed for single-family detached residential uses such as permitted in the requested zone classification (R-75)." [6]

It quickly became apparent that the dispute between the Planning Commission and the planning staff had been resolved. On March 9, 1973 the planning staff sent to the Planning Commission a memorandum including, *inter alia,* the following:

"3. *Present and future transportation patterns:* Lewis Avenue is constructed as a 'secondary industrial' road between this lot and Halpine Road to the southeast, a distance of approximately 1200'. It was constructed to that standard during the 1960's to service this parcel and other industrial zoned lots across the street. Rockland Avenue is a 'secondary residential' road, and access is not permitted to the subject property via Rockland in its present zone. The existing streets are adequate to serve development in the R-75 Zone, however, Lewis Avenue west on this lot is not constructed to industrial standard or intended for industrial use.

---

6. The action reversed the position taken by the Planning Commission in its first application, wherein mistake had been asserted as the sole ground for reclassification.

"4. *Compatibility with existing and proposed development in the area*: The subject parcel is the only undeveloped property in the area. A Use Permit Application is now pending however for construction of a 32,400 square foot speculative industrial building on this lot. Such use would be compatible with the existing industrial development directly across Lewis Avenue, but would be incompatible with the most proximate uses which are single family detached residences.

"Reclassification to R-75 would allow use of the subject property in a manner fully compatible with the surrounding residential area.

"5. *The relationship of the proposed Map Amendment to the adopted Master Plan*: The subject property is shown on the proposed land use plan of the adopted Master Plan as 'general industrial'. This reflected the existing zoning in effect at the time the Plan was prepared. Reclassification to R-75 would permit uses on the property which are not consistent with the designation on the land use plan. Reclassification to R-75 would be consistent, however, with the *stated* goals and objectives of the Master Plan, particularly the 'preservation of established neighborhoods'.

"6. *The recommendation of the Planning Commission*: The Commission should forward a recommendation to the Mayor and Council for reclassification of the subject property to the R-75 Zone."

On March 15, 1973 the Planning Commission [7] forwarded to the Mayor and Council of Rockville its recommendation for

---

**7.** On this occasion the Planning Commission members present were Commissioners Ecker, Humphrey, Quinn and Northway. The dissenting negative vote at the prior recommendation (Whitlock) was unaccounted for. Commissioner Humphrey indicated that he "favored postponement of the public hearing until 'land swap' negotiations could be completed."

approval of the requested rezoning. That recommendation included, *inter alia*, the following:

"3. *Present and Future Transportation Patterns*: Lewis Avenue is constructed as a 'secondary industrial' road between this lot and Halpine Road to the southeast, a distance of approximately 1200 feet. It was constructed to that standard during the 1960's to service this parcel and other industrial zoned lots across the street. Rockland Avenue is a 'secondary residential' road, and access is not permitted to the subject property via Rockland in its present zone. The existing streets are adequate to serve development in the R-75 Zone, however, Lewis Avenue west on this lot is not constructed to industrial standard or intended for industrial use.

"4. *Compatibility with Existing and Proposed Development in the Area*: The subject parcel is the only undeveloped property in the area. A Use Permit Application is now pending however for construction of a 32,400 square foot speculative industrial building on this lot. Such use would be compatible with the existing industrial development directly across Lewis Avenue, but would be incompatible with the most proximate uses which are single family detached residences.

"Reclassification to R-75 would allow use of the surrounding property in a manner fully compatible with the surrounding residential area.

"5. *The Relationship of the Proposed Map Amendment to the Adopted Master Plan*: The subject property is shown on the proposed land use plan of the adopted Master Plan as 'general industrial'. This reflected the existing zoning in effect at the time the Plan was prepared. Reclassification to R-75 would permit uses on the property which are not consistent with the designation on the land use plan. Reclassification to

R-75 would be consistent, however, with the *stated* goals and objectives of the Master Plan, particularly the 'preservation of established neighborhoods.'

"Therefore, on motion by Mr. Northway, duly seconded and carried, with Mr. Humphrey voting in the negative, the Commission forwards to the Mayor and Council its recommendation for approval of Map Amendment Application M-233-73. Mr. Humphrey favored postponement of the public hearing on this matter until the prospects of a land-swap were brought to a final determination."

Hearing on the new application opened on March 20, 1973 with Commissioner Ecker, Chairman of the Planning Commission, explaining to the Mayor and Council that the Commission was not trying to show error but was relying upon changes in the character of the neighborhood. He declared: "Originally, this land was zoned industrial before it was ever brought into the city. In fact, and when it was brought into the city there was nothing but an open field around it. Since that time, the area surrounding it has developed into residential, single family houses. So, that now you have a piece of property which is rimmed on three sides by residences, single family residences, clearly the character of the neighborhood. So it has changed." He then said, " * * * I would like to ask Mr. Hillman,[8] the Planning Director to expand on the thoughts that I have just presented."

Mr. Hillman described terrain features of the subject property, stating that it "slopes into the residential area" with a corresponding slope toward the railroad tracks from the other side of Lewis Avenue. He said that the Planning Commission felt that the neighborhood had changed with the development of the streets and residential areas, so that the subject property had become more importantly a part of

---

8. The record discloses no explanation for the departure of Acting Planning Director Bathke whose testimony at the hearing on the first application has been outlined *supra*.

the residential community. He made reference to the single zoning reclassification of the small parcel from I-2 to R-75. Mr. Hillman testified that when the area was originally zoned there was one owner of the entire industrial site to which access was provided by Halpine Road, commenting that "it was a logical use of his property for that one year. *Later, Lewis Avenue was cut through and the residential development came in,*[9] and the land was sub-divided down. * * * It is now many different pieces of property. There are now roads through it so that access is coming off more than one point and that now there is residential belt completely surrounding this particular piece of land." (Emphasis added.)

The witness acknowledged that he knew of no change in the neighborhood since the adoption of the Master Plan for the City of Rockville, and conceded it showed the property "just exactly the way it is now [before reclassification]." He conceded, in short, that the entire 10.5 acre tract of industrial land (including the subject property shown undeveloped) bore I-2 zoning in the most recent Master Plan. He acknowledged that the Planning Commission on September 13, 1972 had recommended and the Mayor and Council of Rockville had thereafter adopted it without changes. Mr. Hillman, a professional planner, declared that he thought that the mere fact of a population increase in the residentially zoned portion of the neighborhood, itself constituted a change in the character of the neighborhood.

Eight residents of the community testified at the March 20th hearing. Their combined evidence in summary pointed out: the single zoning reclassification; language contained in the Master Plan that one of its purposes was to preserve residential neighborhoods; that the proposed use of the subject property for industrial purposes "has crystalized the neighborhood, as you can see, in total opposition of this case." Some expressed unbuttressed general opinions that the safety of school children from traffic dangers was increased. Some asserted that before the introduction of the

---

**9.** Exhibit B, *supra,* demonstrates the inaccuracy of that comment with reference to the residential development.

industrial portion of Lewis Avenue there was no commercial traffic coming down it from north to south and that the closing of Halpine Road had altered the traffic pattern. They pointed out that since 1957 thirteen dwellings had been constructed on lots formerly affording green space and stressed that the subject property had been utilized by community children for kite flying, sledding and other play. The hearing then was recessed and resumed on May 15, 1973.

At the latter hearing Warren Hillman, Director of Planning, defined the neighborhood as a parcel contained within Halpine Road, Ardennes Avenue, across Midway to Matthews Drive, then proceeding to and along the B & O tracks until they reach Halpine Road.[10] Hillman retreated from the initial concession by Planning Commissioner Ecker that the requested rezoning was not being sought on the basis of error. He said: "Their [Planning Commission] argument is that based on two changes, one is the change in the character of the neighborhood and one is that there was a mistake in the original zoning. Since the rezoning of 1957, the Planning Commission argues that the change in the character of the neighborhood has occurred and their argument is based on that since the 1957 zoning, some 15 houses, shown here in black, and are shown on Exhibit B, * * * have been built. * * * Also a parcel of land across the street from the property in question, which is shown here * * * on Exhibit A, has been rezoned from I-2 to R-75. * * * Halpine Road, which crossed the B & O track shown on Exhibit B, has been closed to through traffic as shown on Exhibit A, and that also * * * Lewis Avenue and Rockland Avenue, shown on Exhibit A, have been built since the zoning, comprehensive zoning, was done in '57." He added, "The neighborhood has become more residential in character by the construction of these 15 homes. When Rockland and Lewis Avenue were built, the property in question became

---

10. The neighborhood thus defined may be visualized by referring to the reproduced portions of Exhibits A and B. The eastern terminus of the residential area (not shown thereon) would be an extension of Ardennes Avenue northward to intersect a line drawn from Matthews Drive.

separated from the I-2 property. * * * and that constituted a change." He added that the subject property "has been informally used as a park or play field, which further illustrates its use and interpretation by the community as a part of that residential area." He added: "The Planning Commission argues that the original zoning was a mistake, because the existing topography oriented this parcel of land towards the residential areas." He suggested that the original zoning seemed to be based on an assumption that the I-2 parcel would be developed as one piece, noting that sub-division of the industrially zoned land on Lewis Avenue occurred after 1957. A suggested residential development plan for the subject tract was offered in evidence. It depicted a development of seven residences oriented side or back to Lewis Avenue around a cul-de-sac entered from Rockland Avenue.

Hillman acknowledged that Halpine Road had been closed at the railroad crossing in September, 1965 before adoption of the most recent Master Plan for the City of Rockville and that *all* development (except two dwellings south of the subject land) had occurred within the zoning classifications applied to the neighborhood in 1957.

Witnesses Jerry Ontko, asserting that he spoke in behalf of the Triangle Protective Association composed of approximately 90 residents of the area, and Richard R. Haight, describing himself as Chairman of the Twin Brook Advisory Board, both of whom had testified at previous hearings, reiterated community displeasure with use of the subject property for industrial purposes, but offered no additional suggestions of error in original zoning or of changes in the character of the neighborhood other than as previously recited.

It was agreed that the record made at the hearing on December 5, 1972 on application M-226-72 would constitute part of the record in the second application.

At the conclusion of testimony, ordinance 27-73, manifestly drafted prior to the final hearing, was introduced. It was enacted on May 21, 1973. After preambles

referring to the hearings of March 20, 1973 and May 15, 1973 (but without reference to the hearing of December 5, 1972), the ordinance declared that "the granting of this application will promote the health, security and general welfare of the community of the City of Rockville."

The ordinance then recited findings of fact, the pertinent parts of which are as follows:

"(3) *Present and Future Transportation Patterns*: That it is hereby found and determined that the subject property has frontage on an industrial section of Lewis Avenue which gives no outlet to areas outside the neighborhood without traversing residential streets, and the property also has frontage on Rockland Avenue, a residential street, and that such residential streets are capable of adequately supporting residential use of the property, but cannot support industrial traffic.[11]

"(7) *Change in Character of the Neighborhood and Mistake in Existing Zoning Classification*: That it is hereby found and determined that there has been a substantial change in the character of the neighborhood since the present zoning of the subject property sufficient to warrant reclassification of the subject property to R-75, and that alternatively, the existing zoning classification is a mistake. The 1957 Comprehensive Zoning Plan mistakenly placed the property in an industrial classification. At the time the area was already an established residential neighborhood and the subject property was bounded on the northwest, north, northeast, east and the southeast by residentially zoned property. The subject property was, in effect, isolated from the rest of the industrial tract, since it did not have any industrial access road to serve it. Consequentially, for years the property remained vacant and undeveloped due

---

11. There is no evidence to support this conclusion as we have pointed out *supra*.

to its inaccessibility. On the other hand, as a residential use, the subject property could have been served by residential access roads. With such available access, the property could have been profitably developed as a residential property, rather than lay dormant as an industrial use.[12] It is therefore apparent that it was a mistake to place the subject property in the existing zoning classification. It is also apparent that there has been a substantial change in the area since 1957. Since that time, the property southeast of and immediately adjacent to the subject property has been reclassified from I-2 to R-75. Further residential development has occurred in the neighborhood east, north and northwest of Lewis Avenue, clearly defining the residential character of the neighborhood beyond Lewis Avenue. In 1957, the subject property was part of a large, undivided tract of industrial property and both Lewis and Rockland Avenues had not been extended through the industrial tract. Since 1957, both Lewis and Rockland Avenues have been extended so as to front the Lewis Avenue Triangle on both sides, thereby cutting off the subject property from other industrial land. There is no longer a cohesive and contiguous parcel of industrial property. With the extension of Lewis and Rockland Avenues, the Lewis Avenue Triangle has become closely aligned with the surrounding residential neighborhood east of Lewis Avenue, making residential reclassification appropriate. Light industrial development across Lewis Avenue has further delineated the residential character of the property, acting as a buffer between the B & O Railroad line and the Lewis Avenue Triangle, by screening from sight the railroad tracks and trains behind the

---

12. The record does not support the finding that the land remained undeveloped due to inaccessibility or that it could profitably be developed for residential use.

industrial properties. This serves to make residential development of the property both appropriate and compatible with the existing adjacent residential properties. It is therefore apparent that the existing zoning classification is a mistake, and, even if not, there has been a substantial change in the character of the neighborhood where the property is located since the time it was placed in the existing zoning classification sufficient to warrant the proposed reclassification."

The property owner appealed to the Circuit Court for Montgomery County. The action of the Mayor and Council of the City of Rockville was affirmed and an appeal to this Court taken.

It will be observed that the ordinance declared that the original zoning was the product of initial error and that reclassification also was warranted by changes in the character of the neighborhood. We have pointed out, *supra*, that application M-233-73 alleged change only. There is doubt whether the question of "mistake" was properly presented to the Mayor and Council, to the trial court, or to this Court. Nonetheless, the Mayor and Council, at least in part, bottomed the rezoning ordinance upon error, and the trial court considered but rejected error as a proper basis for reclassification. We shall, therefore, consider the contention that there was original error as well as the contention that changes altered the character of the neighborhood. See *Pattey v. Board of Co. Commrs.*, *supra*, at 359 [146].

### Error

The oral opinion of the trial court rejected the contention of the appellee that original zoning was the product of mistake, saying, "I am unable to find evidence in the record which shows that there was any legal error or mistake made in the classification of this industrial property at the time of the original zoning." We agree. We have already explained, *supra*, that no evidence of such error or mistake was produced at the prior hearing under the earlier application.

At the hearings upon the second application, error was suggested because the topography oriented the subject property toward the residential areas. The invalidity of that suggestion is demonstrated by the decision in *Greenblatt v. Toney Schloss*, 235 Md. 9, 200 A. 2d 70, wherein the Court said at 13-14 [73]:

"In our view, no probative evidence of error in the zoning of the property in 1957 was presented to the Board. The most that the applicant for change showed and all that the Board decided was that the drainage course would be a logical place to draw the line because the actual development of the R. 40 and R. 20 areas nearest the property had been such as to make the tract in question more compatible with its neighboring land to the west than with the land to the east. Assuming this to be true, it does not show original error. It was logical and appropriate to use the property line as a boundary in 1957. *Perhaps ideal or even more nearly ideal planning in 1957 would have foreseen the way in which the developers would put in streets and lots and have enabled the zoning legislators to use the drainage course as a preferable boundary, but this does not mean that it was then error in a legal sense to have used the property line.* 'It hardly needs to be said again that in zoning a line of demarcation must be drawn somewhere,' (*Shadynook, supra,* at p. 272 of 232 Md.), and the use in 1957 of a property line which was then proper and appropriate (as is shown by the fact that in 1964, as has been true from 1957 on, the property can be as well developed for R. 40 use as for R. 20 use, according to the uncontradicted testimony) was not error simply because it is now revealed that subsequent events (the manner of development of contiguous lands) have made it more logical or desirable or economically profitable that the division line be a natural contour line." (Italics supplied.)

### Change

We will comment at the outset that the doubt expressed by the Planning Commission respecting *down-zoning* (see footnote 1 *supra*) was set to rest by the decision in *Mayor and Council of Rockville v. Stone,* 271 Md. 655, 319 A. 2d 536. *Stone* makes crystal clear that when change in the character of the neighborhood justifying *down-zoning* is shown by evidence sufficient to make the issue one for reasonable debate, no impediment to such a zoning change exists. Rezoning in such a case would be impermissible only when the owner was deprived of *all* beneficial use of the property. See *Baltimore v. Borinsky,* 239 Md. 611, 622, 212 A. 2d 508, 514.

We are rigidly limited in this appeal to a determination whether there is *any evidence tending to support the finding* that changes had occurred that altered the character of the neighborhood. *Baker v. Montgomery Co. Council,* 241 Md. 178, 186, 215 A. 2d 831, 835. The Mayor and Council of Rockville declared that there was evidence of such changes. The trial court affirmed. We hold that there was no legally sufficient evidence of *any* change in the character of the neighborhood.

The zoning authorities had professed to find as a fact that the "residential streets are capable of adequately supporting residential use of the property, *but* cannot support industrial traffic." The record lends no support. We have heretofore detailed *all of the evidence bearing on this question.* There is not a scintilla of evidence to support the Mayor and Council's finding of fact. The only expert witness (produced by the property owner) stated that any increase in traffic volume caused by use of the property within its original zoning would be infinitesimal. The reports of the Planning Commission staff and the traffic engineer do not in reality contradict that testimony. Nor does any witness. It is true that there were generalized complaints about conditions of traffic. What was said in *St. Mark's Church v. Doub,* 219 Md. 387, 394, 149 A. 2d 779, 783, applies here with equal force: "There was no evidence that *congestion* at this location ever had been, or would likely be, a major problem, given proper

traffic control. We hazard a guess that appellants have confused volume with congestion. They are neither synonymous or necessarily closely related."

The ambivalence of the Planning Commission's reliance upon "change" or "error" produced a circumlocution in its recommendations; in the second recommendation of its staff; in the testimony of witnesses for the applicant; and in the ordinance of reclassification itself, that has masked, but it could not blot out this stark, unvarnished fact: *The record shows two and only two changes since the original zoning was applied in 1957.* They are (1) the introduction of Lewis Avenue as a 48 foot industrial road, and (2) the closing of Halpine Road at its grade crossing of the B & O tracks. Neither effect a change in the character of the neighborhood.

Alteration of road patterns or introduction of new highways, or both, have provided much grist for the zoning mill. The myriad cases where such a change was but one of many changes furnish little guidance in the subject case. Here road change furnishes the *sole basis* suggested as justifying the reclassification.

Appellee places heavy reliance upon *Jobar Corp. v. Rodgers Forge,* 236 Md. 106, 202 A. 2d 612. In *Jobar,* although the newly introduced highway was stressed as the most important factor justifying reclassification, there was evidence of multiple other changes and a showing of substantial error. Moreover, the case is clearly distinguishable because the new highway served to provide a nexus between major traffic arteries and residential communities not provided by any other route.

A trilogy of cases serves well to demonstrate that careful scrutiny will be given to a contention that the introduction of new highways justifies or compels zoning reclassification. Those cases are: *Finney v. Halle,* 241 Md. 224, 216 A. 2d 530; *Beth Tfiloh v. Blum,* 242 Md. 84, 218 A. 2d 29; and *France v. Shapiro,* 248 Md. 335, 236 A. 2d 726. All involved, *inter alia,* the effect upon a neighborhood produced by the introduction of the Baltimore Beltway.

In *Halle, supra,* the majority opinion (Hammond, J. dissenting) stated at 237 [536-37]:

"The first and the most important change in the neighborhood of the subject property was the construction of the Beltway. The location or possible construction of the Beltway was not indicated on the comprehensive zoning map when it was promulgated. The condemnation petition to acquire the necessary portion of the Pillbox Farm for construction was filed in 1961 and the Beltway was constructed in that location in 1962. We have already described the astounding effect the construction of the Beltway had on the Pillbox Farm. It cut it into two parts. It destroyed the dwelling house, barn and other outbuildings. It denied access to a substantial portion of the Pillbox Farm to the south of the Beltway which was taken by the State Roads Commission and later sold to the Druid Ridge Cemetery. It prevented the running of sewers down Park Heights Avenue because of the bridge over that road. It completely destroyed the country manor-type use to which the property had been put prior to the construction of the Beltway."

Judge (later Chief Judge) Hammond's dissent had declared at 244-45 [541]:

"The fact that part of the Halle tract was taken—at a full price—for Beltway use does not change the character of the part remaining or of other adjacent land nearby and north of the Beltway. All such land north of the Beltway on both sides of Park Heights Avenue still remains wooded and undeveloped, except by occasional individual homes on large lots. One has only to drive the Beltway to know that hundreds of individual homes line both sides of it in various areas, and its presence does not necessarily change the character of abutting land from that devoted to individual residences to more intense uses. There are no unusual circumstances here that would alter

this general rule and make the Beltway, of itself, constitute a change in conditions."

In *Beth Tfiloh, supra,* the Court of Appeals, first declaring that it was "experiencing a feeling of de ja vue," recognized that it was "revisiting *Finney v. Halle.*" Nonetheless, it said at page 90 [33]:

"While the Beltway *and the extended sewer and water services* impinge on the Beth Tfiloh property in a manner somewhat different from the Halle property the impact, we think, is nonetheless ·· substantial." (Italics supplied.)

In *France, supra,* however, where reclassification was sought for the property immediately adjoining that of *Beth Tfiloh,* the Court of Appeals called a halt, saying at 343 [731]:

"We did not intend *Halle* to be taken as authority for the proposition that all property adjoining the Beltway, whether or not adversely affected, had undergone so substantial a change as to be a candidate for rezoning. *Halle,* on its facts, was an extreme case, where the construction of the Beltway severed the property, involved the destruction of the improvements, and left a tract for which the requested reclassification was justified. *Halle* should be compared with *Greenblatt v. Toney Schloss Properties Corporation,* 235 Md. 9, 200 A. 2d 70 (1964), where a change in access to the subject property caused solely by the Beltway was held to be insufficient change to support a reclassification from R-40 to R-20, even though the tract was cut off from other R-40 property and access could be had only through R-20 property."

The Court concluded (P. 345 [732]):

"For the reasons stated, it is our conclusion that the issue presented to the County Board of Appeals

was not supported by substantial evidence and thus was not fairly debatable; that the requested reclassification should not have been granted; and that the order entered by the court below should be reversed."

We regard the language used in *Greenblatt v. Toney Schloss, supra,* to be of real significance here (P. 13 [72]):

"The Board said, entirely rightly we think, that '[s]imply because a piece of ground must be reached by driving through another zoning classification is certainly not sufficient reason to reclassify the landlocked parcel to the same classification as the property that has been used to gain entrance' * * * "

In *Board of Co. Commrs. v. Kines,* 239 Md. 119, 210 A. 2d 367; *Dorf v. Mullendore,* 255 Md. 367, 258 A. 2d 223; *Miller v. Abrahams,* 257 Md. 126, 262 A. 2d 524, the Court struck down reclassifications granted upon the ground that road change justified such action. We regard them as controlling here.

In *Kines, supra,* the Court of Appeals adopted in part the opinion of then Circuit Judge Digges (P. 124 [370]):

"I conclude that the road improvements referred to in the testimony, and those to be improved in the immediate future if any, cannot solely be the cause of a zoning reclassification. The Court feels that the existence of new roads is a factor to be taken into consideration, but without some other change in the community or neighborhood the roads mentioned as constructed or to be shortly constructed thereby lessening the distances between points of employment and proposed living quarters cannot justify the action taken in this case,"

and concluded (P. 124-25 [370]):

"We think Judge Digges' analysis of the evidence and his views as to the applicable law both were

sound. There was no claim of original error and a reasoning mind would not reasonably have found that there had been presented to it evidence of changes in the neighborhood substantial and pertinent enough to permit, much less compel, piecemeal rezoning. This is to say that the matter of change was not reasonably debatable."

In *Dorf, supra,* the Court of Appeals again adopted in part the opinion of the trial court (Raine, J.) (Pp. 370-71 [224-25]):

" 'The only change in the area since the adoption of the map in 1962 is the completion of a long awaited project, to wit, the widening of Liberty Road. This arterial highway was widened from 22 feet to 60 feet, and additional traffic lights have been installed. This improvement in traffic conditions has not changed the essential character of the area in which the subject property is located, and the mere widening of the highway cannot, in itself, be considered a change that would justify a reclassification,' " adding (P. 371 [225]):

"In light of Judge Raine's pithy statement and what we have said so very recently in cases not very much unlike the instant case, we do not see what useful purpose could possibly be served by further exercitation."

In *Miller, supra,* the Court of Appeals said at 131 [527]:

"Abrahams contends, albeit halfheartedly, that the realignment and widening of Old Court Road, as actually accomplished in 1966, contributed in large measure to a change in conditions which, in turn, effected a substantial change in the character of the neighborhood. The same argument in respect of an almost identical situation was made, and rejected, in *Wells v. Pierpont, supra. See also Dorf v. Mullendore,* 255 Md. 367 (1969).

"Once more we repeat that

'[i]t is now firmly established that there is

> a strong presumption of the correctness of * * * comprehensive rezoning, and that to sustain a piecemeal change therefrom there must be produced strong evidence of * * * substantial change in the character of the neighborhood, * * * [and] the burden of proof facing one seeking a zoning reclassification is quite onerous.' *Wells v. Pierpont, supra* at 557.

> "As Abrahams failed to sustain the burden of proving mistake in the 'first telling,' so has he failed here to sustain the burden of proving a substantial change in the character of the neighborhood."

The common thread running through these three cases is that road changes, to justify a piecemeal zoning reclassification, must destroy the *strong presumption* of the correctness of original zoning and constitute *strong evidence* that such change has affected the character of the neighborhood. See also *Clayman v. Prince George's Co.*, 266 Md. 409, 292 A. 2d 689; *Border v. Grooms*, 267 Md. 100, 297 A. 2d 81.

Reclassification cannot be justified on the basis of the closing of Halpine Road. The character of the neighborhood remained, after the change, precisely what it had been before it occurred, namely, a planned heterogeneous neighborhood of adjoining industrial and residential uses. Established as such in 1957, it retained that identity in the Master Plans adopted in 1960 and 1972. Neighborhood development proceeded as planned within original zoning applied in 1957 to the point where it is, save for the subject tract, now fully developed in accordance with that plan.

Manifestly, the extension of Lewis Avenue as an industrial road cannot serve to justify rezoning here. Nothing could be clearer than that Lewis Avenue intentionally was introduced to facilitate and did in fact facilitate industrial use of the I-2 zoned land in accordance with the Master Plan. This is dramatically shown by the fact

that after its introduction, the actual use of the planned industrial land, previously slow, by 1973 had reached the point where the subject tract was the sole remaining undeveloped tract of land bearing such zoning.

The suggestion that the subject tract, industrially planned and zoned, somehow lost its industrial identity because an industrial highway was introduced that provided substantially all of its road frontage is illogical and unsound. See *Habliston v. City of Salisbury*, 258 Md. 350, 265 A. 2d 885, wherein down-zoning from industrial to residential was reversed, the Court saying at 363 [891]:

> "For some time now we have labored in the shadow of that 'strong presumption of the correctness of original zoning' which makes 'onerous' the burden of proof facing one seeking a zoning reclassification. We must, therefore, be always mindful, in dealing with that sometimes misty concept, 'change in the character of the neighborhood,' to be sure that the evidence thereof is evidence of a *substantial* change."

The physical relationship between the subject tract and the neighboring residentially zoned lands was not altered in any way by the introduction of Lewis Avenue. It was contended that industrial use of the subject property would provide an "opening wedge" for industrial expansion into the residentially zoned area. The suggestion is without merit. The evidence is uncontradicted that required screening will isolate the subject tract from the residential area and that an "outlot," incapable of use for *any* purpose, intervenes between it and Rockland Avenue (except at its brief frontage at the intersection with Lewis Avenue.)[13] Moreover, the uncontradicted evidence shows that with industrial use of the subject tract *all development* of the neighborhood will have been completed. It is difficult indeed to imagine, under such circumstances, that any zoning authority would grant a

---

13. The record shows that no access to Rockland Avenue from the subject tract is permissible if it is used for industrial purposes.

future piecemeal reclassification, or that if it did so, such action would survive judicial scrutiny.

It is true that industrial use of the subject property is opposed by substantial numbers of residents of the neighborhood, many of whom desired continuance of the green play area it afforded to the children of the community in its dormant days. We find most apt here the language of the Court of Appeals of Maryland in *Mayor and Council of Rockville v. Cotler*, 230 Md. 335, 340, 187 A. 2d 94, 97:

> "Here we think that the action of the City which purported to be and, we think, was rezoning was arbitrary, discriminatory and unreasonable. It flew in the face of facts developed at the hearing and, without any showing of adequate cause therefor, it deprived the appellees of the use of part of their property for which it was best suited. Here we find elements of a decision being based upon a plebiscite of neighbors, which is not permissible (*Montgomery County Council v. Scrimgeour*, 211 Md. 306, 313, 127 A. 2d 528; *Benner v. Tribbitt*, 190 Md. 6, 57 A. 2d 346); of a decision not based upon evidence, which is also not permissible (*Hedin v. Board of County Commissioners of Prince George's County*, 209 Md. 224, 233-36, 120 A. 2d 663); and finally, and here perhaps most important of all, of an effort to create a no man's land or buffer zone in property of the appellees for the benefit of others by preventing the appellees from using their property for any of the purposes for which it is peculiarly suitable. That, too, is not permissible. *Northwest Merchants Terminal, Inc. v. O'Rourke*, 191 Md. 171, 187, 60 A. 2d 743; *Hoffman v. City of Baltimore*, 197 Md. 294, 79 A. 2d 367; *Hedin v. Board of County Commissioners of Prince George's County, supra*, 209 Md. 224, at 232. The cases last cited are, we think, controlling here. We, of course, recognize the rule that the fact that some other use than that which is permitted under applicable zoning may be more profitable than that which is permitted is not

of itself sufficient to overturn the established zoning, but here we find no sound basis for the limitation sought to be imposed. The matter is not, we think, in the range of fairly debatable."

Here too, we think that the action of the City was arbitrary, discriminatory and unreasonable.

> *Order reversed.*
>
> *Case remanded for the passage of an order conforming with the views expressed in this opinion.*
>
> *Costs to be paid by appellee, except costs of appellants' brief, which are to be paid by appellant.*[14]

---

14. Brief includes appendix not authorized by Md. Rule 1031.